512 S.E.2d 539

**Dorothy L. DIXON, Respondent–Appellant,**

v.

**Samuel L. "Teddy" DIXON, Appellant–Respondent.**

**No. 2940.**

Court of Appeals of South Carolina.

Heard Nov. 5, 1998.

Decided Feb. 8, 1999.

Rehearing Denied March 27, 1999.

224

Douglas Kosta Kotti; and Ken H. Lester, of Lester & Jones, both of Columbia, for appellant-respondent.

Robert Rosen, of Rosen, Goodstein & Hagood; and Diane C. Current, of Nexsen, Pruet, Jacobs, Pollard & Robinson, both of Charleston, for respondent-appellant.

PER CURIAM:

Dorothy L. Dixon (the Wife) and Samuel Dixon (the Husband) both appeal from a family court order granting a divorce to the Wife on the ground of adultery, equitably distributing the marital estate, and awarding alimony to the Wife. We affirm as modified.

## I. Background

The parties were married on September 18, 1952, when they were both eighteen years old. They have six children, all of whom are emancipated.

The Wife worked outside the home for only the first two months of the marriage. She has a high school education, but never obtained any further formal education or training. During the marriage, the Wife was responsible for cooking, cleaning, grocery shopping, and caring for the parties' children, all of whom were born during the first ten years of the marriage. The majority of household duties fell to the Wife, particularly given that the Husband was out of town a great deal during the first eight years of the marriage.

The Husband has a tenth-grade education and worked in the crane and rigging industry throughout the marriage. When the parties were first married, the Husband was employed with a company in Savannah, Georgia. In 1967, the parties moved to Charleston, South Carolina. In 1968, the

Husband began working for Charleston Steel Erectors, eventually becoming vice-president.

In 1984, the Husband acquired the assets of Charleston Steel Erectors through a multi-million dollar lease-purchase transaction. Thereafter, the Husband's company was known as Crane & Rigging Services, Inc. (C & R). The Husband twice restructured the sale transaction, once in 1986 and again in 1989. According to the Husband's accountant, the second restructuring was done primarily to provide certain tax benefits to Charleston Steel. C & R was successful enough to allow the Husband to earn $100,000 per year income as reported on his income tax returns. The Husband also earned as much as $60,000 per year in additional unreported cash income, apparently earned through the sale of scrap metal.

The parties separated in October 1990, after the Husband confessed to the Wife that he was having an adulterous affair. In November 1990, the Wife instituted this action against the Husband. By order dated July 1, 1992, the family court granted the Wife a divorce on the ground of adultery and reserved all remaining issues for later determination.

In July 1991, C & R filed for bankruptcy, seeking to reorganize under Chapter 11 of the Bankruptcy Code. In April 1992, C & R filed an optimistic plan of reorganization. The disclosure statement filed with the plan stated that "prospects for a successful recovery appear very good. [C & R] provides a wide variety of work to its many customers. These customers ... have a need for the type of services [C & R] renders." However, in August 1992, just four months after filing its reorganization plan, C & R amended its bankruptcy pleadings to seek to liquidate its assets under Chapter 7 of the Bankruptcy Code. By December 1992, essentially all assets of C & R had been sold.

The final merits hearing in this action was held in April 1993. By order dated September 15, 1993, the family court awarded the Wife $1,000 per month in alimony, valued the marital estate at $634,207.82, and awarded 75% of the estate to the Wife and 25% to the Husband. When valuing the marital estate, the family court found that C & R had no value because it had been liquidated during the pendency of this action.

Both parties filed post-trial motions seeking reconsideration of the final order. The family court issued its order on the motions to reconsider on February 26, 1996. While the court made certain amendments to the 1993 order, the amended order did not alter the equitable apportionment of the marital estate or the alimony awarded to the Wife.[1]

## II. Equitable Distribution

Both the Husband and the Wife appeal various aspects of the family court's equitable distribution award. The Wife's primary argument is that the family court erred by assigning no value to C & R in its valuation of the marital estate. The Husband's primary argument is that the family court erred by awarding the Wife 75% of the marital estate.

### A.

The Wife argues that the family court erred by not including in the marital estate the value of C & R at the time the action was commenced. We agree.

Subject to certain exceptions, "marital property" includes "all real and personal property which has been acquired by the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation." S.C.Code Ann. § 20-7-473 (Supp.1997). Thus, for purposes of equitable distribution, the value of marital property is the value of the property at the time of the commencement of the marital litigation. *See Mallett v. Mallett,* 323 S.C. 141, 151, 473 S.E.2d 804, 810 (Ct.App.1996) ("Marital property is valued as of the date of the filing of the complaint."), *cert. denied* (March 6, 1997); *Jamar v. Jamar,* 308 S.C. 265, 267, 417 S.E.2d 615, 616 (Ct.App.1992) ("The proper date to value marital property is the time the marital litigation is filed or commenced."). There is no dispute that C & R existed and was in operation in October 1990, when this action was commenced. Thus, at first blush, it seems clear that C & R's value as of October 1990 should have been included in the marital estate. The question, however, is whether the post-

---

1. We will refer to the September 15, 1993 order as amended by the February 26, 1996 order as the "Final Order."

filing bankruptcy and ultimate liquidation of C & R change this conclusion.

It is an unfortunate reality that, given the volume of cases handled by our family courts, there often is a substantial delay between the commencement of an action and its ultimate resolution. Thus, it is not unusual for the value of marital assets to change, sometimes substantially, between the time the action was commenced and its final resolution. In such a case, the family court has the ability to consider the post-filing appreciation or depreciation when valuing and apportioning the marital estate. *See McDavid v. McDavid,* 333 S.C. 490, 497, n. 7, 511 S.E.2d 365, 369, n. 7 (1999) ("[B]oth parties may be entitled to share in any appreciation in marital assets which occurs after the parties separate but before the parties divorce.") (citing *Smith v. Smith,* 294 S.C. 194, 363 S.E.2d 404 (Ct.App.1987)); *Mallett,* 323 S.C. at 151, 473 S.E.2d at 810 (affirming valuation of husband's business as of time of final hearing where business had, through no fault of either party, declined in value by more than $30,000 since commencement of action; concluding "it would be grossly unfair to value this asset as of the date of the commencement of the action").

In this case, if the evidence had established that the decline of C & R was not the fault of either party, we might well have concluded that the family court did not abuse its discretion by assigning no value to C & R. In our view, however, the evidence clearly, if not overwhelmingly, establishes that the Husband set out to destroy C & R solely for the purpose of depriving the Wife of any interest in the company. *See, e.g., Epperly v. Epperly,* 312 S.C. 411, 414, 440 S.E.2d 884, 885 (1994) ("In an action on appeal from the Family Court, this Court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence.").

Several witnesses testified that the Husband announced his intention to destroy his business. The parties' oldest daughter testified that on the day the Husband left the marital home, he assured her and her sisters that he would take care of and provide for the Wife. However, during a subsequent phone conversation, the Husband accused his daughter of advising the Wife to retain an attorney. The Husband told the daughter that "if [the Wife] messed with him, he would fix

it so she wouldn't have a roof over her head." Another daughter testified that the Husband stated he was "going to get rid of everything. And if [the Wife] kept messing with him as far as getting attorneys, that he would bankrupt the company and there would be nothing left for [the Wife] to get." The Wife testified that her son warned her "that if [she] messed with the business that [the Husband] would file bankruptcy."

Even more compelling is the testimony of Dr. Robert Glenn, a close friend of the Husband. Glenn testified that in September 1990, just one month before this action was commenced, the Husband confided that he was contemplating a divorce from the Wife. Glenn told the Husband a divorce would be an unwise decision because the Wife might be awarded a large portion of C & R. According to Glenn, the Husband responded that "he would make it so there would be no assets" to divide, and would then "start over again."

From the record before us, it appears that during cross-examination of these witnesses, the Husband's attorney did not challenge whether the Husband in fact made these threats. Similarly, the Husband did not deny making the statements when he took the stand. We find this essentially unrebutted testimony to be very persuasive evidence of the Husband's plan to destroy C & R to prevent the Wife from receiving any portion of it. There is also ample evidence in the record establishing how the Husband carried out this plan.

Dr. Glenn testified that the Husband began working less and less in 1991 and 1992, after the commencement of this action. According to Glenn, the Husband was frequently away from his office during the week. Similarly, Charlton Miller, a former C & R employee, testified that the Husband slowed down "considerably" sometime around the summer of 1991.

Joe Hanniford, C & R's former vice president, testified that C & R was "busy" in 1990, prior to the separation and the bankruptcy, and that the company "had cranes going and coming. We had people working." Hanniford stated he was surprised by the Husband's announcement of the bankruptcy filing. Hanniford testified that the Husband changed his work habits after the bankruptcy, noting that the Husband went

from taking "a major interest in the company" and working extended hours to arriving at work late in the morning and leaving at lunch. According to Hanniford, "things just sort of seemed to deteriorate day by day" after the bankruptcy filing.

The Wife testified that her son told her about a conversation he had with the Husband about "making a go" of C & R. The Husband's response was "son, I don't want to make a go of this business."

Teresa Camlin, daughter of the man who sold C & R to the Husband in 1986, is part owner of Ashley Steel, a structural steel fabricating company located next door to the former C & R. Camlin testified that C & R seemed to be doing well and was current with the payments due under the agreement with her father until 1990. Camlin noted that during the summer of 1990 (the year this action was commenced), the Husband was rarely at C & R. According to Camlin, 1990 through 1992 were "banner years" for her metal fabrication business, with higher sales than ever before. Camlin testified that "[i]f we fabricate it, someone has to erect it." Camlin, who had knowledge of the crane and rigging industry through her work in metal fabrication, testified that there were numerous jobs C & R could have bid on but did not.

The testimony of these witnesses supports the Wife's argument that the Husband simply quit devoting the proper time and attention to C & R in order to destroy it. The rise of Miller Rigging, a company that performs, on a smaller scale, essentially the same work as C & R, just as C & R was entering its final decline, further supports this argument.

Miller Rigging is owned by Mildred Fann and. Charlton Miller, two of C & R's most valuable employees. Miller and Fann were still employed by C & R when they established Miller Rigging in July 1992, just one month before C & R filed with the bankruptcy court its request to liquidate rather than reorganize. Miller and Fann needed only $5,000 to start Miller Rigging, and the company had enough customers from the outset so that Miller and Fann continued to earn the same amount of money they did at C & R, without even missing a paycheck. As of January 31, 1993, seven of Miller Rigging's eight employees were former C & R employees, and all but two of its customers were former customers of C & R. Many

of those customers, including its biggest customer, initially sought out C & R and spoke to Miller in his capacity as a C & R employee. The customers hired Miller Rigging only after Miller informed them that C & R would be going out of business.

Given the success of Miller Rigging, we find the Husband's argument that C & R failed because of a recession in Charleston and the closing of the naval base unconvincing. While some witnesses testified that a recession affected C & R's business and the industry as a whole, the Husband presented no economist or other expert witness to testify about the existence of a recession in Charleston during the relevant time period, nor did he present any evidence establishing that C & R's business was dependent on the naval yard.[2] Given that customers were still seeking C & R's services even after the first bankruptcy filing, it seems likely that, had the Husband had any interest in saving his company, C & R could have reorganized instead of liquidating. Thus, the evidence in the record convinces this Court that C & R, at the very least, could have successfully operated on a smaller scale, much like Miller Rigging.[3] Accordingly, we conclude that the Wife established that the Husband intentionally sabotaged his own business in order to keep the Wife from receiving any interest in the business.

---

2. The Husband and his son did testify that one of C & R's major customers refused to allow him to bid on any projects after C & R filed for bankruptcy and that one or two other customers refused to give the company any work after the bankruptcy filing. However, evidence of what may have happened *after* the bankruptcy filing is not relevant to the question of whether the bankruptcy was precipitated by genuine economic circumstances or by the Husband's desire to ensure that the Wife did not receive any portion of C & R.

3. That the bankruptcy court approved the liquidation of C & R in no way convinces us that the liquidation could not have been avoided. Kevin Campbell, the Husband's bankruptcy attorney, testified that a bankruptcy attorney representing the debtor does not operate the business and, absent some indication of fraud, has no independent duty to investigate the facts as presented to him by the Husband and his accountant. Campbell testified that he did not conduct an audit of the business and was in fact completely reliant on the representations of the Husband and the Husband's accountants. Moreover, Campbell conceded he did not monitor the Husband's business during the bankruptcy proceedings and he therefore had no way to know whether the Husband made a sincere effort to salvage the business.

We need not, however, rely only on our view of the evidence as gleaned from a cold record to conclude that the Husband intentionally destroyed C & R. Although the family court assigned no value to C & R, the Final Order makes clear that the family court likewise determined that the Husband intentionally destroyed C & R. *See Stevenson v. Stevenson,* 276 S.C. 475, 477, 279 S.E.2d 616, 617 (1981) (broad scope of appellate review in family court actions "does not require us to disregard the findings of the lower court."). In its factual findings, the court noted that "once the Husband decided to bankrupt [C & R], he decided not to work to any great extent.... The evidence certainly convinces this Court that the Husband might have stayed in business had he worked as he did in the past." Moreover, in its conclusions of law with regard to the value of C & R, the court stated:

The case law is clear that a party who dissipates or fraudulently conveys marital assets should be made to answer for those actions at the time of division of the marital estate.... Where one spouse has dissipated marital assets, the court will value the assets as of some date before the dissipation and treat the dissipated assets as part of the dissipating spouse's share of the marital estate.

The court concluded that it was "undisputed that [C & R] had a substantial value as of the date of the filing of the complaint. The Husband was in sole control of the asset and therefore should answer for its demise." Given these statements, it is apparent the family court was convinced, as are we, that the Husband intentionally destroyed C & R after this action was commenced.

In light of the powerful evidence of the Husband's wrongdoing, and the family court's acceptance of that evidence, we conclude that to assign a zero value to C & R rewards the Husband, solely at the Wife's expense, for his wrongdoing. *See McDavid v. McDavid,* 333 S.C. 490, 496, 511 S.E.2d 365, 368 (1999) ("[T]here must be some evidence of willful misconduct, bad faith, intention to dissipate marital assets, or the like, before a court may alter the equitable distribution award for such misconduct."); *cf. Herron v. Johnson,* 714 A.2d 783, 785 (D.C.1998) ("Upon a finding of dissipation, the court *must* distribute the property in question—and enter judgment accordingly—whether or not the asset still exists.") (emphasis

added); *Sharp v. Sharp*, 58 Md.App. 386, 473 A.2d 499, 505 (if the chancellor "finds that property was intentionally dissipated in order to avoid inclusion of that property towards consideration of a monetary award, such intentional dissipation is not more than a fraud on marital rights, and the chancellor should consider the dissipated property as extant marital property . . . to be valued with other existing marital property.") (citations omitted), *cert. denied*, 300 Md. 795, 481 A.2d 240 (1984). Instead, the value of C & R at the time of filing must be included in the marital estate. *See, e.g., Mallett*, 323 S.C. at 151, 473 S.E.2d at 810 ("Marital property is valued as of the date of the filing of the complaint.").

█ Gerald Feinberg, the Wife's expert, determined that the net value of C & R, as of the date of filing, was $339,306. He made this determination by considering the fair market value of the company's fixed assets (primarily cranes and other equipment) in existence on the date of filing, financial statements and other information provided by the Husband or his accountant, and adjusting for the company's liabilities. We find this to be a proper determination of C & R's value at the time of filing. *See, e.g., RGM v. DEM*, 306 S.C. 145, 152, 410 S.E.2d 564, 568 (1991) ("Marital businesses are to be valued at fair market value as ongoing businesses."). Accordingly, we conclude that C & R was worth $339,306 at the time of filing, and that this amount should be added to the marital estate. The more difficult question, however, is how this value should be allocated between the parties.

█ Had C & R been in existence at the time of the final hearing, it likely would have been awarded solely to the Husband, given his importance to the business and the Wife's minimal involvement in the day-to-day operations. Other marital assets would have been awarded to the Wife to bring the equitable division in line with the percentage allocation of the estate as determined by the family court. In this case, however, to assess the entire value of C & R against the Husband's share of the marital estate will have severe consequences. The value we have assigned to C & R, although an accurate determination of its value at the time of the commencement of this action, is nonetheless an artificial value in one sense, given that C & R in fact no longer exists. Thus,

every dollar of C & R's value that we assign to the Husband amounts to a dollar reduction in his realized share of the marital estate. Because C & R is the single largest asset in the marital estate, the Husband's share of the marital estate will be reduced dramatically.

However, were we to assess any portion of C & R's value against the Wife's share of the marital estate, we would be reducing her realized share of the marital estate. Thus, to assess *any* portion of the C & R's value against the Wife would reward the Husband for his economic misconduct and punish the Wife, who was completely without responsibility for the demise of C & R. Accordingly, we conclude that the only equitable way to allocate the value of C & R is to assess its entire value against the Husband's share of the marital estate. *See Cooksey v. Cooksey,* 280 S.C. 347, 352, 312 S.E.2d 581, 585 (Ct.App.1984) (en banc) (recognizing that "courts of other jurisdictions have held that a spouse who removes or secretes marital property in contemplation of divorce is required to either account for it or have some part of its value charged against that spouse's share of the marital property," and remanding for a determination of whether the wife "should be required to account for the disposition of the disputed marital funds"); *cf. In re Marriage of DeVine,* 869 S.W.2d 415, 426–29 (Tex.Ct.App.1993) (affirming trial court's 60%–40% distribution in favor of husband where wife's 40% share of marital property included $500,000 in no longer existing funds that the jury determined had been misappropriated by the wife; effect of distribution was that wife received only 11.5% of existing assets), *writ denied* (June 22, 1994).

We fully recognize that our disposition of this issue will work a severe financial hardship on the Husband. It is, however, a hardship entirely of the Husband's own making. Notwithstanding the emotional upheaval and animosity that all too frequently accompany divorces, all parties in divorce actions have a duty to proceed fairly and responsibly during the course of the litigation. *See* S.C.Code Ann. § 20–7–472(3) (Supp.1997) (When apportioning marital property, the family court should consider, *inter alia,* "[t]he contribution of each spouse to the acquisition, *preservation, depreciation,* or appreciation in value of the marital property.") (emphasis added). Clearly, the Husband did not behave fairly during the pen-

dency of this action. To allow the Husband to escape, at the Wife's expense, even a portion of the financial consequences of his actions would be inequitable and inconsistent with the goals of the Equitable Apportionment Act. *Cf. Berish v. Berish,* 69 Ohio St.2d 318, 432 N.E.2d 183, 185 (1982) ("If a trial court was rendered powerless to recognize and determine property rights in assets that do not exist at the time of the final decree, one party, from the time of separation to the time of the final decree, could withdraw all funds and, unilaterally and with impunity, squander the fruits of the marital labor. Such a position would ... be antithetical to public policy."). We therefore conclude that the full value of C & R must be assessed against the Husband's share of the marital property.

B.

Because we have concluded that the full value of C & R must be included in the marital estate and must be assessed against the Husband's share of that estate, we must now consider whether the family court properly apportioned the marital estate between the parties. The Husband contends that the family court's award to the Wife of 75% of the marital estate is excessive. We agree.

Although the Husband contends that the Wife was at fault, the family court accepted the Wife's evidence as to the break-up of the marriage, specifically finding that the Husband's adultery caused the breakup of the marriage. Concluding that the Husband's "marital misconduct should be considered as a factor against him and in favor of [the Wife] in dividing the parties' marital property," the court awarded the Wife 75% of the marital estate and the Husband 25% of the estate.

Certainly, marital misconduct is an appropriate consideration when apportioning the marital estate. *See* S.C.Code Ann. § 20–7–472(2) (Supp.1997) (requiring family court to consider when apportioning the marital estate "marital misconduct or fault of either or both parties, whether or not used as a basis for a divorce as such, if the misconduct affects or has affected the economic circumstances of the parties, or *contributed to the breakup of the marriage.*") (emphasis added). However, we believe awarding the Husband, who made the overwhelming majority of the direct contributions to the

marital estate, only 25% of the marital estate is too severe a sanction, even considering that he is at fault for the dissolution of the marriage. *See, e.g., Noll v. Noll,* 297 S.C. 190, 196, 375 S.E.2d 338, 342 (Ct.App.1988) ("Fault is a factor for the court to consider in an equitable division award although it does not justify a severe penalty."); *Rampey v. Rampey,* 286 S.C. 153, 156, 332 S.E.2d 213, 214 (Ct.App.1985) ("Although fault does not justify a severe penalty in making a division of marital property, it is a factor the court may consider in determining the equities between spouses."). A 25% distribution to the Husband, particularly after our treatment of C & R, would be unjustifiably punitive.

Accordingly, we modify the family court's apportionment of the marital estate by awarding the Wife 60% of the estate and the Husband 40% of the estate. Given that the Husband was at fault for the breakup of the marriage and that the Wife will be forced to bear the harsh economic consequences of the Husband's actions, we believe such a distribution to be fair and equitable.

C.

The Husband also contends the family court erred by including in his allocation of the marital estate certain property owned by the parties' son. We find no error.

During the course of the marriage, the parties gave their son 3.7 acres upon which to build a house. Thereafter, the son signed an agreement whereby he agreed to pay his parents the fair market value of the land should he ever decide to sell the property. An appraisal valued the land (without improvements) at $18,500. The family court included this $18,500 in the marital estate and assigned it to the Husband.

Contrary to the Husband's argument, the family court did not award him the land owned by the son. Instead, the court effectively treated the son's obligation created by the agreement as an account receivable, and assigned that asset to the Husband. Given that the son sided with the Husband in this action and no longer has any meaningful relationship with the Wife, we find no error in the family court's disposition of this issue. *See Ellerbe v. Ellerbe,* 323 S.C. 283, 293, 473 S.E.2d 881, 887 (Ct.App.1996) (where wife loaned money to emanci-

pated daughter, directing family court on remand to treat debt as receivable to the wife).[4]

## D.

Both the Husband and the Wife assert the family court erred in other particulars in valuing and apportioning the marital estate. We find no manifest abuse of discretion or other reversible error in connection with these claims. Accordingly, we decline to address these issues in detail and affirm the family court's disposition of the remaining equitable apportionment claims. *See, e.g., Doe v. Doe,* 324 S.C. 492, 502, 478 S.E.2d 854, 859 (Ct.App.1996) ("The apportionment of marital property is within the family court judge's discretion and will not be disturbed on appeal absent an abuse of discretion.").

## E.

■ Our conclusions discussed above as to the proper treatment of C & R and the proper allocation of the marital estate impact the equitable distribution award as follows. The family court valued the marital estate at $634,157.82. Adding to that total the value we have assigned to C & R increases the total marital estate to $973,463.82. Based on our 60%–40% distribution, the Wife is entitled to $584,078.29 of the estate, while the Husband is entitled to $389,385.53.

Under the family court's distribution, the Husband received $163,556.75 [5] in marital assets, which, of course, did not include any portion of C & R. When that distribution is added to the $339,306 value of C & R, which we have determined should be assessed solely against the Husband's share of the marital estate, the Husband will have received (or be deemed to have received) $502,862.75 in marital assets, $113,477.22 more than he is entitled to under our modified distribution. Clearly

---

4. We note that the Husband does not argue on appeal that the contingency of the son's obligation under the agreement should affect the valuation of the account receivable created by the agreement.

5. The Final Order indicates that the total property awarded to the Husband was $163,606.75. However, when the values of each item awarded to the Husband are added to together, the total amounts to $163,556.75.

then, some adjustment to the Husband's distribution must be made.

The assets distributed to the Husband by the family court include a Colleton County farm the Husband purchased during the marriage, valued at $82,000, and various items of the personal property. The farm was primarily a "hobby" for the Husband, and the Wife apparently had little involvement with it. Similarly, the personal property awarded to the Husband consisted primarily of items the parties treated as belonging to the Husband during the marriage, such as the Husband's gun collection, car, and jewelry. Under these circumstances, we do not believe it would be fair to require the Husband to convey any of these items to the Wife to balance out the equitable distribution award. Instead, we conclude that the fairest means of effecting the distribution of marital assets is to allow each party to keep the items awarded by the family court in the Final Order and to grant the Wife a money award in the amount of $113,477.22.[6] If the Husband has not paid this amount to the Wife within 180 days after the date of this opinion, the Wife will be entitled to record a judgment against the Husband for the unpaid amount.[7]

We recognize that the Wife will bear the risk associated with collecting any money judgment. Nonetheless, our options are somewhat constrained by the size of the marital estate. To require the Husband to equalize the distribution by conveying to the Wife assets awarded to him by the family court would leave the Husband with virtually none of the property accumulated over the course of nearly forty years of marriage. Notwithstanding the Husband's economic and marital misconduct, we do not believe such a harsh result is warranted in this case.

---

6. Adding $113,477.22 to the $470,601.07 awarded to the Wife in the Final Order equals $584,078.29, the amount to which we have determined the Wife is entitled.

7. Of course, this award will accrue interest at the statutory postjudgment interest rate. *See Casey v. Casey*, 311 S.C. 243, 245–46, 428 S.E.2d 714, 716 (1993) ("We find fixed awards of money for equitable distribution shall accrue interest at the post-judgment rate from the date of the judgment, or in the case of specified periodic payments, from the date each payment becomes due and owing.").

### III. Alimony

 Both parties also appeal the family court's award to the Wife of $1,000 per month in permanent periodic alimony. The Wife contends the alimony is insufficient, while the Husband contends the Wife is not entitled to any alimony.

When determining whether to award alimony, the family court must consider, *inter alia*, the employment history and earning potential of each spouse; the current and reasonably anticipated earnings of both spouses; the marital and nonmarital properties of the parties, including those apportioned to him or her in the divorce action; and the standard of living established during the marriage. S.C.Code Ann. § 20–3–130(C) (Supp.1997). Marital fault may be considered when awarding alimony in cases where misconduct affected the economic circumstances of the parties or contributed to the breakup of the marriage. S.C.Code Ann. § 20–3–130(C)(10) (Supp.1997).

Our application of the statutory factors to the facts of this case convinces us that the award of $1,000 per month alimony to the Wife is insufficient. This was a thirty-nine year marriage, and both parties were fifty-eight years old at the time of the hearing. The parties enjoyed a fairly high standard of living during the marriage, living in a $235,000 home situated on over 30 acres of land, spending money freely, and vacationing frequently. The marriage ended because of the Husband's adultery.

As noted above, the Husband reported approximately $100,-000 per year in income and he earned as much as $60,000 per year in additional unreported cash income. At the time of trial, the Husband was earning $8.00 per hour as a bulldozer operator. The Wife's vocational expert, however, testified that, taking into account the Husband's health [8] and his expe-

---

**8.** The Husband testified he suffers from heart problems and chronic back pain. In 1976, he was hospitalized for pericarditis, a viral inflammation of the tissue surrounding the heart. Dr. DeMasi, the Husband's personal physician, testified the pericarditis was treated and resolved. In 1990 the Husband had an abnormal stress test. Dr. DeMasi opined that the stress test revealed "a fair chance" that the Husband has coronary disease, but admitted that the Husband is asymptomatic. Thus far, the Husband has declined to undergo heart catheterization, which would determine with certainty whether he

rience in the industry, the Husband is capable of earning as much as $50,000 per year as a crane crew supervisor or material handling supervisor. The family court agreed with the Wife's claim that the Husband was underemployed, noting that the "Husband is certainly capable of being employed in a high level position in [the crane and rigging] industry." The court, which "questioned the sincerity of the efforts the Husband has made to obtain employment during the pendency of this action," concluded that the Husband was underemployed. We agree with this determination. Thus, the award of alimony to the Wife should be based on the Husband's earning *potential,* rather than his current reduced earnings. *See* S.C.Code Ann. § 20–3–130(C)(4) & –130(C)(6) (requiring family court to consider "the employment history and *earning potential* of each spouse" and "the current and *reasonably anticipated earnings* of both spouses" when awarding alimony) (emphasis added); *Camp v. Camp,* 269 S.C. 173, 174, 236 S.E.2d 814, 815 (1977) (Courts "will closely scrutinize the facts of any case wherein a husband and father voluntarily changes employment so as to lessen his earning capacity and, in turn, his ability to pay alimony and child support monies."); 24A Am.Jur.2d, *Divorce & Separation* § 781 (1998) ("[I]f the obligor spouse has the ability to earn more income than he is in fact earning, the court may impute income according to what he could earn by using his or her best efforts to gain employment equal to his capabilities, and an award of alimony based on such imputation may be a proper exercise of discretion even if it exhausts the obligor spouse's actual income.").

Unlike the Husband, however, the Wife has little income-earning potential. Although the Wife is in reasonably good health, she has not worked outside the home since the early 1950's, and she has no real marketable job skills. According

---

actually has coronary disease. Although Dr. DeMasi advised the Husband to avoid stressful situations, he did not advise the Husband to stop working. As to the Husband's lower back pain, he admitted that he has had the condition all of his adult life, that he is not on any medication, and that it has not prevented him from working or engaging in physical recreation. In any case, the Husband plans to continue working despite any physical maladies he may suffer. Thus, we agree with the family court's conclusion that "[i]t does not appear that the Husband has any serious health problems which would prevent him from working in a business with which he is familiar and which should not cause him undue stress."

to the Wife's vocational rehabilitation expert, the Wife is currently unemployable. The family court agreed with this assessment, specifically finding in the Final Order that the Wife is unemployable.

After considering all the circumstances of this case, we conclude that the Wife is entitled to permanent periodic alimony in the amount of $2,500 per month. This amount, when combined with the Wife's equitable distribution award, should be sufficient to allow the Wife to stay in the marital home and to maintain a standard of living approaching that enjoyed by the parties during the marriage, without serving as a disincentive for the Wife to contribute to her own support or unduly penalizing the Husband for his marital fault. *See Johnson v. Johnson*, 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct.App.1988) ("Alimony is a substitute for the support which is normally incident to the marital relationship. Ordinarily, the purpose of alimony is to place the supported spouse, as nearly as is practical, in the position of support she enjoyed during the marriage."), *cert. denied*, 298 S.C. 117, 378 S.E.2d 445 (1989) (citations omitted); *Donahue v. Donahue*, 299 S.C. 353, 362, 384 S.E.2d 741, 746 (1989) (Alimony "is not intended to penalize one spouse while rewarding the other.").

### IV. Summary

To summarize, we conclude that the family court erred by refusing to assign a value to C & R. Accordingly, we modify the Final Order by assigning a value of $339,306 to C & R and including that value in the total marital estate. We also modify the percentage allocation of the marital estate by awarding 60% of the estate to the Wife and 40% to the Husband. The entire value of C & R shall be assessed against the Husband's share of the marital estate, resulting in an award of $113,477.22 to be paid by the Husband to the Wife as set forth above. Finally, we modify the Final Order by increasing the alimony awarded to the Wife to $2,500 per month. All other aspects of the Final Order are affirmed.

Accordingly, for the foregoing reasons, the order of the family court is hereby

**AFFIRMED AS MODIFIED.**

HOWELL, C.J., ANDERSON and STILWELL, JJ., concur.