538

636 S.E.2d 636

**Elaine M. FULLER, Respondent,**

v.

**William F. FULLER, Appellant.**

**No. 4150.**

Court of Appeals of South Carolina.

Heard June 6, 2006.

Decided Sept. 11, 2006.

Rehearing Denied Nov. 9, 2006.

540

Richard H. Rhodes, of Spartanburg, for Appellant.

David Alan Wilson and Kenneth C. Porter, both of Green-ville, for Respondent.

542

BEATTY, J.:

In this domestic action, William F. Fuller (Husband) appeals the awards of equitable distribution, alimony, and expert fees to his former wife, Elaine M. Fuller (Wife). Husband also appeals the finding that a real estate holding company was a marital asset. We affirm in part, reverse in part, and remand.

## FACTS

Husband and Wife married in 1980, and two children were born of the marriage: William in 1982, and Brittany in 1985. When the couple first married, Wife was employed at South Carolina National Bank. Later, the couple moved to Charlotte and Wife began working in a clothing boutique. During this time, Husband worked at Owens Corning. While Husband and Wife lived in Charlotte, they became interested in selling real estate and attended classes. Upon finishing, they relocated to Greenville, where both still reside. Wife continued to work in real estate until the birth of the couple's children. At that point, Wife became the party primarily responsible for caring for the children and taking care of the home. The couple and their children lived an affluent lifestyle. The parties had a large home in an exclusive area of Greenville, belonged to a country club, and took numerous family vacations. Wife stated that she did not really think about money and bought whatever she wanted for herself and the children.

Early in the marriage, Husband began to work at American Federal Bank and simultaneously began a residential construction company, Fulco Homes (Fulco). Husband and Wife were each fifty percent shareholders in the company. After eight years, Husband was able to pursue Fulco full-time. In exchange for periodically working as a decorator and doing whatever else needed to be done for Fulco, Wife received a salary of $18,000 from Fulco. Husband began Fulco with a loan from his aunt that he repaid in monthly installments with interest. When Husband's aunt died, the unpaid balance of the loan amounted to over $200,000. However, Husband was the beneficiary of aunt's estate, and the debt was forgiven.

Husband and Wife each had interests in numerous companies. In 1989, Husband formed CF Enterprises, a real estate

holding company, with his cousin, Ben Crumpler. Wife's father started Maxwell Family, LLC, (Maxwell Family), which owned a one-third interest in Stonehaven Subdivision Development and various other properties held just for investment purposes. Wife's father gave a fifteen point ninety-four percent interest in Maxwell Family to Wife and a five percent interest to Husband. Both of these interests were gifts, and it is undisputed they are nonmarital. In 2002, Wife received $74,000 from Maxwell Family and Husband received $26,000. In 2003, by the time of the final hearing, Wife received $38,000 and expected to receive around $4,000 more. Because the neighborhood was being "developed out," there were fewer lots remaining and eventually the income from Maxwell Family would dissipate. Additionally, the parties' company, Fulco, did most of its building in the Stonehaven Subdivision.

Wife had interests in other family enterprises, including Maxwell Road Developers[1] and the Maxwell Family Trust. Wife's father also conveyed to Wife a one-ninth interest in Kensington Apartments, LLC (Kensington), which owned and managed one hundred sixty-eight apartment units. Wife received an income from Kensington of $2,500 per month.

In March 2002, Wife discovered Husband was having an affair, and she and Brittany moved to one of the apartment units at Kensington. On April 4, 2002, Wife filed the underlying action, seeking divorce on the ground of adultery, custody of Brittany, child support, alimony, and equitable division of the marital estate. Husband admitted his misconduct and also requested equitable division of the marital estate. At the temporary hearing, the family court awarded Wife custody of Brittany and ordered Husband to pay $1,800 a month in unallocated support.

The final hearing was held in October 2003. Husband and Wife agreed that the assets should, for the most part, be split evenly between the two. Although Wife blamed the breakup of the marriage on Husband's adultery, Husband blamed Wife's overspending and the parties' disagreements on rearing the children. After hearing testimony from both Husband and Wife, the family court granted Wife a divorce based on Husband's adultery. The family court found custody was not

---

1. Maxwell Family has a one-third interest in Maxwell Road Developers.

an issue because both children were over the age of eighteen, but the court ordered child support of $583 per month to support Brittany throughout her senior year of high school. The court also ordered Husband to pay Wife periodic alimony in the amount of $1,200 per month.

The court ordered a split of the remaining marital assets with forty-nine percent going to Husband and fifty-one percent going to Wife. This included CF Enterprises, which Husband maintained was nonmarital. The court ordered Husband to sell the marital home and awarded him eighty-five percent of the house's proceeds after the mortgage was fully paid. The court used the appraisal commissioned by Husband in assessing the value of the home for $650,000. Wife received several bank accounts and an IRA worth $250,000. Finally, the court ordered Husband to pay Wife's attorney's fees and various fees for experts used in assessing the value of the marital property.

Husband filed a timely motion to reconsider and argued, *inter alia*, that the marital home sold for $615,000 after the final hearing rather than the appraised value of $650,000. Husband asserted that because the court awarded him eighty-five percent of the proceeds of the house, his share of the marital assets was substantially reduced and he received closer to forty percent rather than the fifty percent envisioned by the parties. Further, Husband contended he was further prejudiced because the IRA, which the court awarded Wife, substantially increased after the final hearing. On reconsideration, the court adjusted the distribution to account for the inadvertent double counting of the value of a life insurance policy and likewise reduced Wife's interest in Husband's 401k to effectuate a fifty-one/forty-nine split. The court denied Husband's requests to consider the post-hearing increase in the value of the IRA and the actual sales price of the marital home in adjusting the marital distribution. This appeal followed.

## STANDARD OF REVIEW

On appeal from the family court, this court has the authority to find facts in accordance with its own view of the preponderance of the evidence. *Rutherford v. Rutherford,* 307

S.C. 199, 204, 414 S.E.2d 157, 160 (1992). This broad scope of review does not require us to disregard the family court's findings, and we remain mindful of the fact the family court, who saw and heard the parties, is in a better position to evaluate their credibility and assign weight to their testimony. *Cherry v. Thomasson*, 276 S.C. 524, 525, 280 S.E.2d 541, 541 (1981).

## LAW/ANALYSIS

### I. Equitable Division

We first consider the equitable distribution award. Husband argues the family court's error in using the value of the marital home and the IRA provided at the time of the final hearing resulted in Husband receiving only a forty-two percent distribution of the marital assets. Specifically, Husband contends that in the six months between the time of the final hearing and when the family court issued the divorce decree, the marital home sold for $35,000 less than the appraisal and the IRA that was awarded to Wife increased in value by $40,000. Therefore, Husband maintains the family court's error resulted in his distribution of the marital estate being only forty-two percent rather than the fifty percent the parties agreed to. We disagree.

### A. Time of Valuation

Generally, in South Carolina marital property subject to equitable distribution is valued as of the date marital litigation is commenced. *Fields v. Fields*, 342 S.C. 182, 186, 536 S.E.2d 684, 686 (Ct.App.2000); *see Jamar v. Jamar*, 308 S.C. 265, 267, 417 S.E.2d 615, 616 (Ct.App.1992) ("The proper date to value marital property is the time the marital litigation is filed or commenced."). However, "the parties *may be* entitled to share in any appreciation or depreciation in marital assets occurring after separation but before divorce." *Fields*, 342 S.C. at 186, 536 S.E.2d at 686 (emphasis added); *Dixon v. Dixon*, 334 S.C. 222, 228, 512 S.E.2d 539, 542 (Ct.App.1999) ("[G]iven the volume of cases handled by our family courts, there often is a substantial delay between commencement of an action and its ultimate resolution. Thus, it is not unusual for the value of marital assets to change, sometimes substan-

tially, between the time the action was commenced and its final resolution. In such a case, the family court has the ability to consider the post-filing appreciation or depreciation when valuing and apportioning the marital estate.").

In the present case, Husband argues the family court erred in the date on which it valued the marital home and the IRA. Initially, we note that the family court valued the IRA at $250,798. The family court used the IRA's value on the date the final hearing was held rather than the value on the date litigation was commenced. Although the family court did not specify a reason for departing from the general rule that the valuation occurs the date litigation begins, we find the departure benefited Husband. The family court awarded Wife the IRA and any increase in value was taken into account because the family court gave each party nearly fifty percent of the marital estate.

▮ Husband cites *Mallett v. Mallett*, 323 S.C. 141, 473 S.E.2d 804 (Ct.App.1996), for the proposition that when marital property depreciates or appreciates through no fault of either party, it would be "grossly unfair" not to adjust the value. *Mallett*, 323 S.C. at 151, 473 S.E.2d at 810. Husband fails to realize, however, that *Mallett* affirmed valuation of a spouse's business at the time of the *final hearing* where the business had declined in value since commencement of the divorce action. *Id.* We are aware of no case law, and Husband points to none, that requires the family court to reassess any increase in value that occurs *after* the final hearing. Accordingly, the family court did not err by failing to consider the IRA's increase after the final hearing.

▮ A real estate appraiser, hired by Husband, testified at the final hearing that the value of the marital home was $650,000.[2] The final hearing occurred in October 2003, the family court issued the divorce decree on April 2, 2004, and the house sold on May 12, 2004, for $615,000. Because the house sold after the family court issued the divorce decree, we find no error in the family court's failure to reconsider the valuation of the house. Further, the family court has broad

---

2. Despite the appraisal, Husband listed the house for $669,000 and the house remained on the market for over a year before selling.

discretion in valuing marital property, and we discern no error in the court's reliance on the value presented by Husband's expert. *See Fields*, 342 S.C. at 187, 536 S.E.2d at 686 ("The family court has broad discretion in valuing marital property such that this Court will affirm when the findings below are supported by the evidence.").

## B.  Distribution

Husband argues the distribution of the parties' assets and debts were unfair to him because the family court's valuation of the house and IRA resulted in Husband receiving only forty-two percent of the marital assets.  We disagree.

■ Absent an abuse of discretion, the apportionment of marital property will not be disturbed on appeal. *Deidun v. Deidun*, 362 S.C. 47, 58, 606 S.E.2d 489, 495 (Ct.App.2004). On appeal, we look to the overall fairness of the apportionment and if the end result is equitable, it is irrelevant if we would have arrived at a different apportionment. *Id.*

■ In determining an equitable distribution of marital property, the family court must identify, value, and then equitably apportion the property. *Johnson v. Johnson*, 288 S.C. 270, 276, 341 S.E.2d 811, 815 (Ct.App.1986).  The court must consider several factors in making an equitable distribution.  S.C.Code Ann. § 20–7–472 (Supp.2005) (outlining fifteen factors for the family court to consider in equitable distribution).  Included in those factors is the marital misconduct of either party.  S.C.Code Ann. § 20–7–472(2) (Supp.2005) (noting that marital fault is one of the factors to be considered).

At the final hearing, both parties indicated they believed a fifty-fifty split of the marital assets would be fair.  In equitably dividing the marital estate, the family court relied on the values of the assets presented at trial, including the $650,000 value of the marital home and the then-current value of the IRA. The award to Wife amounted to fifty-one percent of the marital estate, while the Husband's award was forty-nine percent.  At the hearing on the motion for reconsideration, the family court realized that one asset was counted twice. The court requested assistance from the parties' attorneys on how best to recalculate the distribution to stay within the

"49/51 split." The order on reconsideration adjusted the distribution to stay within those percentages.

As previously addressed, we believe the family court did not abuse its discretion in relying on the values of the home and the IRA at the time of the final hearing. Although the marital home was still for sale at the time of the final hearing, thus the final value was uncertain, Husband's appraisal valued the home at $650,000. The court awarded Husband eighty-five percent of the house's proceeds. In light of the fact the court attributed the break-up of the marriage to Husband's infidelity, it was not unfair that Husband should be the bearer of the risk that the house should sell for less than the appraisal. Likewise, the increase or decrease in the value of the IRA after the final hearing was uncertain and subject to fluctuating market conditions. We find no error with the court's failure to predict the uncertainties of the market in making a final distribution.

The family court effectuated a nearly even split of the marital assets given the definite values presented at the final hearing. Accordingly, we affirm the family court.[3]

## II. Alimony

Husband argues the family court erred in ordering him to pay Wife permanent periodic alimony in the amount of $1,200 per month. Husband contends the family court failed to take into account Wife's considerable nonmarital assets. We agree.

---

3. Husband also argues that the family court erred in awarding him the Thornblade Country Club membership because neither party would benefit from it once the house in the Thornblade community was sold. However, in his motion for reconsideration and in his arguments at the motion hearing, Husband argued the family court erred in the value assigned to the membership because he would be unable to sell it. Because Husband did not raise the lack of "benefit" argument before the family court below, it is not preserved for appellate review. *Staubes v. City of Folly Beach,* 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (holding that an issue not raised to or ruled upon by the trial judge is not preserved for appellate review). Similarly, Husband's argument that the family court unfairly considered his adultery in equitably dividing the property was not raised before the family court and is not preserved. *Id.*

Alimony is a substitute for the support which is normally incident to the marital relationship, and its purpose is to place the supported spouse as close to the position of support enjoyed during the marriage. *Johnson v. Johnson,* 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct.App.1988). The decision to grant or deny alimony rests within the sound discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Williams v. Williams,* 297 S.C. 208, 210, 375 S.E.2d 349, 350 (Ct.App.1988). "Alimony should not dissuade a spouse, to the extent possible, from becoming self-supporting." *Rimer v. Rimer,* 361 S.C. 521, 525, 605 S.E.2d 572, 574 (Ct.App.2004). There are several factors the family court must consider in deciding whether to award alimony:

(1) the duration of the marriage and the ages of the parties at the time of the marriage and at separation; (2) the physical and emotional condition of each spouse; (3) the educational background of each spouse and the need for additional education; (4) the employment history and earning potential of each spouse; (5) the standard of living established during the marriage; (6) the current and reasonably anticipated income of each spouse; (7) the current and reasonably anticipated expenses of each spouse; (8) the marital and nonmarital properties of the parties; (9) the custody of any children; (10) marital misconduct or fault; (11) the tax consequences of the award; (12) the existence of support obligations to a former spouse; and (13) such other factors the court considers relevant.

S.C.Code Ann. § 20–3–130(C) (Supp.2005); *Epperly v. Epperly,* 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994) (noting the statute "sets forth 12 factors which *must* be weighed when determining alimony"). The family court may weigh these factors as it finds appropriate. S.C.Code Ann. § 20–3–130(C) (Supp.2005) ("In making an award of alimony ... the court must consider and give weight in such proportion as it finds appropriate to all of the following factors.").

At the temporary hearing, Wife submitted a financial declaration showing expenses for herself and Brittany, then eighteen, of $4,358 per month. Without explanation, Wife's financial declaration at the final hearing showed expenses of $9,243 per month. After Husband and Wife separated, Wife pur-

chased a home for herself from Kensington for $200,000 [4] and extensively remodeled the home for an additional $100,000. Wife also managed to save $50,000, and her nonmarital assets were valued at $603,901.

In the final order, the family court found Wife had primarily been a homemaker and mother. The court found that Wife had an income of $2,500 per month from Kensington and then imputed to her an additional earning capacity of $1,200. In assessing Wife's income, the court did not include any future payments from Maxwell Family because the amount Wife would receive in the future was too uncertain. The court reasoned that Wife would no longer have income from Fulco, which was awarded to Husband, and that her employment decisions changed as a result of her role as homemaker and mother. The court found that even though Husband's financial declaration showed a monthly deficit, with expenses of $7,795.18 and a net income of only $4,986, he had been able to pay the $1,800 a month of unallocated support to Wife that was granted at the temporary hearing, stating "[a]lthough [Husband] shows a monthly deficit it is obvious . . . he has the ability to make the alimony payment out of his income as he has done so . . . and . . . the most recent financial declaration does not reflect [Husband] has incurred an additional indebtedness nor invaded any assets to meet his monthly deficit." In the portion of the order addressing Wife's entitlement to alimony, the court merely stated that Wife had "demonstrated a need and [Husband] has shown an ability to pay alimony."

It is difficult for this court to discern what factors the family court considered in awarding Wife alimony. The family court only cited Husband's ability to pay and Wife's "need" in awarding alimony. It is unclear which of Wife's financial declarations the court relied upon in determining Wife's "need." It does not appear the court considered that Wife's expenses nearly doubled from the time between the temporary and final hearing. *See* S.C.Code Ann. § 20–3–130(C)(7) (Supp. 2005) (stating that court must consider "the current and reasonably anticipated expenses and needs of both spouses").[5]

---

4. Kensington bought the house for $269,000 and then Wife bought the house from Kensington for $200,000 with a bank loan.

5. There was also some evidence Wife's financial declaration was inflated. For example, Wife's financial declaration shows an expense of

It is also unclear whether the court considered Wife's substantial nonmarital assets in determining her "need." Moreover, the family court's order did not state how it arrived at Wife's imputed income nor did it consider the fact that Husband's testimony revealed that he incurred approximately $49,000 to $50,000 worth of debt since the couple separated.

We recognize that the family court could weigh the statutory factors as it deemed appropriate. Because the court relied *only* on Wife's need and Husband's ability to pay alimony in making its determination, we believe the court erred by not also considering Wife's nonmarital assets. Further, although different portions of the order note the length of the marriage, the parties' health, Husband's infidelity, and Wife's income potential, it does not appear from the order that the court considered these matters in awarding alimony. We agree with Husband that the family court failed to consider all the statutory factors in awarding Wife alimony. Accordingly, we reverse the alimony award and remand the matter for a hearing to determine Wife's entitlement to alimony based upon a consideration of all the statutory factors.

### III. CF Enterprises

█ Husband contends the family court erred in finding CF Enterprises was a marital asset. He argues the money used to start the company was a gift from his aunt and is a nonmarital asset. We disagree.

█ Marital property is generally defined as all real and personal property acquired by the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation, regardless of how legal title is held. S.C.Code Ann. § 20–7–473 (Supp.2005). However, property is considered nonmarital if it is acquired by gift or inheritance. S.C.Code Ann. § 20–7–473(1) (Supp.2005). Because of the general presumption that property acquired during the marriage is an asset of the marriage, the burden to show an asset is nonmarital is upon the party claiming the nonmarital status. *Brandi v. Brandi*, 302 S.C. 353, 356, 396 S.E.2d 124, 126 (Ct.App.1990).

---

$457 per month for Brittany's private high school when her testimony revealed a family trust pays for Brittany's schooling.

CF Enterprises had two stockholders, Husband and his cousin, and they started it with an initial investment of $15,000 each. Husband maintains no marital money was used to start or finance the company and that the money he used was a gift from his aunt. Wife contends the money Husband used was a loan from his aunt. During the hearing, Husband offered no proof by way of check or testimony that CF Enterprises was nonmarital. Additionally, his financial declaration stated the source of the company was a "loan." Because Husband did not produce evidence to rebut the presumption that CF Enterprises was marital, we find the family court did not err. Accordingly, we affirm the family court's finding that CF Enterprises was an asset of the marriage.

## IV. Expert Fees

■ Finally, the Husband contests the award of expert fees to Wife. He maintains Wife failed to produce evidence to support the award. We agree.

Although alimony and suit money is provided for by statute, "the claim must be 'well founded' [and the] burden of proving that a claim is well founded is on the party seeking suit money." *Taylor v. Taylor,* 333 S.C. 209, 220, 508 S.E.2d 50, 56 (Ct.App.1998) (quoting S.C.Code Ann. § 20-3-120); S.C.Code Ann. § 20-3-120 (Supp.2005) (noting that a party in a divorce action may request attorney's fees and costs and the court shall grant a reasonable sum if the claim appears "well-founded").

The family court ordered Husband to pay $2,222 for Wife's forensic economist and $682 for copies of documents Wife made for the C.P.A. Wife testified that forensic economist Dr. Charles Alford gave her "a wonderful three or four page sheet with the little details that [she] needed to think of what [she] would spend." Dr. Alford did not testify nor did Wife affirmatively establish what services he performed. Further, Wife testified that she paid for $682 worth of copies from the C.P.A. but produced no receipt. Wife had the burden to establish her claim was well-founded. Because she produced no evidence supporting the award of fees other than her brief reference to their existence, we find the family court abused

its discretion in ordering Husband to pay these fees. Accordingly, we reverse these awards.

## CONCLUSION

For the foregoing reasons, the decision of the family court is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HUFF, and STILWELL, JJ., concur.