# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Khalil Abbas-Ghaleb, Appellant-Respondent,

v.

Anna Ghaleb, Respondent-Appellant.

Appellate Case No. 2022-000505

———————

Appeal From Aiken County
Vicki J. Snelgrove, Family Court Judge

———————

Opinion No. 6057
Heard October 10, 2023 – Filed April 29, 2024

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————

Matthew B. Robins, of Strom Law Firm, LLC, of
Columbia, and Gary Hudson Smith, III, of Smith,
Massey, Brodie, Guynn & Mayes, LLC, of Aiken, both
for Appellant-Respondent.

Gregory S. Forman, of Gregory S. Forman, P.C., of
Charleston, for Respondent-Appellant.

———————

**MCDONALD, J.:** In this contentious marital litigation, Khalil Abbas Ghaleb
(Husband) appeals the family court's final orders, arguing the court erred in (1)
awarding Anna Ghaleb (Wife) primary custody of the parties' young daughter; (2)
granting Wife decision-making authority, other than as to medical decisions; (3)
allowing Wife to claim Daughter as a dependent for tax purposes; (4) equitably
apportioning the marital estate; (5) precluding Husband from taking Daughter to

Lebanon; and (6) ordering Husband to pay $40,000 of Wife's attorney's fees. In her cross-appeal, Wife challenges: (1) the equitable distribution; (2) the visitation and medical decision-making authority awards; and (3) the denial of her request for post-trial attorney's fees. We affirm in part, reverse in part, and remand to the family court to revalue and reapportion certain financial accounts.

**Factual and Procedural Background**

Husband and Wife met in October 2013 while Wife was stationed at Fort Gordon in Georgia; they married on June 25, 2017. Throughout the majority of their brief marriage, the parties lived separately.[1] Husband lived in Aiken and worked as an advisory scientist designing nuclear processes for the Savannah River Site MOX Project; Wife lived in the Washington, D.C. area where she worked for the United States Air Force at Fort Belvoir as a linguist and translator with top secret security clearance. While living apart, the parties did not merge their funds or accounts.

According to Wife, the parties' marital disputes began on their wedding night and Husband "talked about divorce for the first time" on their honeymoon. Despite this, Wife became pregnant, left the military, and moved to Aiken to live with Husband and stay home with the baby.[2] Shortly thereafter, Husband learned he might lose his job due to the termination of the MOX Project and told Wife he was considering a position in Washington state. Wife recalled Charlotte, Tennessee, and Cape Canaveral were also options.

Husband helped Wife pack and move to Aiken; however, when Wife arrived, she became upset because Husband put most of her belongings in the attic and would not let her sleep in his bedroom. Wife then left and went to stay with her mother (Grandmother) in Florida without telling Husband. On August 30, 2018, Husband sent Wife the following WhatsApp message:

> 1. First option: You are to come live as my wife with me. I provide and protect you and I work like I do now from morning to evening to provide [for] you and the child and

---

[1] Although Wife sponsored Husband's 2018 green card, the parties lived together for only seven months while married.

[2] Husband suggested Wife should remain in D.C. and continue working for the Air Force. He claims the parties' problems began "immediately upon cohabitation."

you on the other hand follow my rules.  My rules are a guide for you and the children on the right path.  Having order in our life, eat on time, have a clean house, talk respectfully to older people etc[. are] the examples and the teaching that I want to give to my children.  If my children don't learn this from me and see me and their mom follow these rules and they don't follow these rules they are not my children and I don't want them.  [If my wife and children don't live with me, I am not to provide for them.  If my sister gets married she is to live with her husband and it's the case of your sister and any woman.  Jesus and St Paul asked men to not divorce their women because they know that the women will suffer by themselves.  But if the women wants to leave that's her fault.][3]

2. Second option: You continue living with your mom.  I don't provide anything to you nor the baby.  You go find a job and work to raise him, and don't ask me for anything.  I might not even be in the US to even ask me.  I will have nothing to do with you.[4]

Wife returned to Aiken two weeks later, but the parties kept separate bedrooms. Husband later invited Grandmother to stay and help with the baby; he also paid for her plane ticket.  The parties' marital problems escalated following Grandmother's arrival and Daughter's birth in November 2018.

Although Wife's water broke between 6:00 and 7:00 a.m. on the day Daughter was born, she declined to go to the hospital immediately.  Husband testified he "begged her for three hours to go to the hospital" before ultimately threatening to call the police.  Wife eventually agreed to go, and Daughter was born at the hospital that evening.  Before the baby's hospital discharge, however, the parties disagreed over whether she should receive the recommended Vitamin K shot and neonatal prophylactic eye treatment—Wife ultimately refused both.  The parties agreed to

---

[3] Husband included the third set of brackets in the message.

[4] The family court order references this communication as the "Prebirth Message." Husband offered no testimony addressing the message at the final hearing.

delay the recommended Hepatitis B vaccine because Daughter "was at low risk for acquiring this disease."

Once Daughter came home from the hospital, the parties had a litany of disagreements regarding her health and wellbeing, including: how Wife should breastfeed; whether Husband should use video monitors to watch the bassinet and crib while he was away; when and how to bathe the baby; baby's proper bath temperature; the proper temperature of the home; the frequency of diaper changes; the tightness of swaddles; whether Wife could leave the house with the baby while Husband was at work; whether and where Wife was permitted to travel with the baby; what type of clothing the baby should wear; whether the baby could use certain comfort items, including but not limited to how much pacifier time she was allotted; whether to keep a clock in the nursery; whether the baby should be given probiotics, Tylenol, or other medication; whether the baby should receive treatment from chiropractor Chris Walker;[5] how and where she would be baptized;[6] and how to address the baby's struggle to gain weight.

The parties further disagreed about which vaccinations Daughter should receive (as well as when she should receive them). Husband wanted Daughter to receive the vaccinations recommended by pediatrician Paula Luther, but Wife again refused to consent. Wife explained she initially objected for religious reasons based on her belief that some vaccines contained fetal cell tissue. Although Wife later acknowledged this misgiving was misguided, she still sought to have Daughter receive certain vaccines on a delayed schedule. Husband took Daughter to the pediatrician for her first vaccinations without Wife's knowledge on March 8, 2019.

---

[5] When Wife ultimately took Daughter to chiropractor Walker while Husband was at work, he called the police. Husband threatened various medical providers with law enforcement and litigation on more than one occasion.

[6] Wife is a devout member of the Russian Orthodox Church, and Husband is a Maronite Catholic. Before they married, the couple signed a document indicating their children would be baptized in the Maronite Catholic Church in exchange for the couple's marrying in the Russian Orthodox Church. Husband testified he did not attend church at all between Daughter's birth and the time the parties separated. After the separation, Wife expressed her preference to baptize Daughter in the Russian Orthodox Church, however, Husband had the child baptized in the Maronite Catholic Church without Wife's knowledge or consent.

As early as November 2018, Dr. Luther noted Daughter was having issues gaining weight.[7] Thus, she referred the family to a speech therapist to determine whether a problem with the baby's mouth was affecting her ability to breastfeed; Dr. Luther further recommended supplementing the baby's diet with formula. According to Husband, Wife refused to supplement with formula and insisted upon "my milk or no milk." Wife supplemented Daughter with bottled breastmilk and testified Daughter's weight struggles were related to her latching problems. Daughter was seen by a lactation consultant;[8] speech therapist; ear, nose, and throat specialist William Wells; and pediatric dentist Adam Hahn. At a December 19 visit, Dr. Wells found the baby had an enlarged superior labial frenulum and lip-tie and noted he "[s]pent the majority of the visit discussing treatment options to include a frenectomy." Although Wife wanted Daughter to have the frenectomy, Husband preferred to wait and see if the baby would gain weight on her own before subjecting her to the procedure. The parties ultimately agreed to wait.

Nevertheless, in March 2019 while Husband was on a business trip in Salt Lake City, Wife took Daughter by Uber to Dr. Hahn's Columbia office for an evaluation. Dr. Hahn diagnosed Daughter with a Grade 4 lip and tongue-tie, and Wife consented to a frenectomy.[9] When Husband discovered where they were, likely from the automated Uber receipt, he called Dr. Hahn's office and threatened a lawsuit. Husband later called Wife and asked to see the baby through FaceTime; Wife refused. After Wife also refused Husband's request to fix the baby monitor over Daughter's crib, Husband sought to return home early from his business trip.

During a phone call later that day, Husband told Wife, "You can't understand how happy I am to be free from you. . . . And you take care of [Daughter] because I cannot take care of her. You know. So, I am so glad. And again, I hope you are not expecting any financial [inaudible], right?" Wife responded that Husband still needed to repay her the $25,000 she loaned him to purchase his Jaguar—less $5,000 he paid for Wife to get her master's degree—so she could properly care for Daughter; however, Husband told her that he no longer owed her anything because

---

[7] In the four months following her birth, Daughter's weight percentile dropped from sixty-fifth to three.

[8] The lactation consultant's notes from a December 3, 2018 visit indicate "a high narrow palate and difficulty with the top lip clanging out during feeding."

[9] Daughter's weight improved slightly following the frenectomy. Between March and July 2019, her weight percentile went from three to nineteen percent.

she had harmed Daughter by taking her to get the frenectomy.[10]  Husband also texted Grandmother and told her he wanted her to leave his house.  Wife texted Husband inquiring, "Just so I understood you right when we talked earlier you want me, my mom and [Daughter] to leave."  Husband responded, "It's not true. Your text is suggesting that I want [Daughter] to leave.  [Daughter] is in my [heart] whatever you do.  It's not true that I want her to leave."  Wife noted she could not go anywhere without Daughter and told Husband they were leaving for Grandmother's house.  Husband recommended Wife "start looking for a job in Florida" because he intended to close their shared bank account.

Upon his return around midnight on March 16, Husband found Wife and Grandmother packing to leave for Florida.  Husband blocked Wife's car in the driveway, locked Daughter's car seat in his car, removed Daughter from her crib, and locked her in his bedroom.  As the parties argued, Husband accused Wife of being an inattentive mother and noted he had vaccinated Daughter, replaced her probiotics, and secretly supplemented her diet.  When Wife expressed her concern that Husband had been feeding the four-month-old solid food, Husband responded, "You know what I'm worried about?  Is that a man can be with you and can rape her without you knowing.  That's how a mother doesn't know anything."  Husband repeated this comment later when Wife referenced the cameras he had placed in the home.  Wife eventually called the police, who directed Husband to allow Wife to leave with the baby.  Although Husband was initially noncompliant, he eventually allowed the officers to retrieve the car keys from his safe and unblock Wife's vehicle.  The officers explained Wife could temporarily take Daughter to Florida but would have to return for a judge to consider custody.

At daybreak, Wife and Grandmother took Daughter to a hotel in Augusta. Following multiple unsuccessful attempts to contact Wife, Husband was able to track her because the parties shared location data.  He then drove to the Augusta hotel and called the police, reporting he wanted to speak to Wife and see Daughter. Wife declined, and law enforcement instructed Husband to leave.

---

[10] At trial, Husband testified Wife did not loan him the money to buy the Jaguar and claimed she gave it to him.  On cross-examination, Husband refused to agree that "car loan" was on the memo line of the check and alleged someone must have added the notation after the fact.  When asked whether he paid Wife back for "any of this loan," Husband responded, "I paid for her tuition at the University."

While Wife and Daughter were staying with Grandmother in Florida, Husband contacted Wife through email, WhatsApp messaging, and video calls. Wife testified many such communications pertained to finances and taxes but noted she participated in two video calls per week to allow Husband to see and interact with the baby. However, Husband claimed Wife refused to allow him to communicate with Daughter and often responded to his messages with financial demands or the occasional picture or video. Husband claims he was precluded from seeing Daughter between March 16 and April 21, 2019, when the record contains proof that the parties began video visitation.

Wife subsequently invited Husband to her May 2019 graduation in Washington D.C., where she allowed him two hours of supervised visitation per day. While there, Husband gave Wife a note indicating he wanted to see Daughter in person at least once a month and have at least two thirty-minute video visits each week. Husband claims Wife denied him in-person visitation with Daughter, allowed him only three-and-a-half hours of video visitation between Easter and mid-July, and insisted Husband's mother not participate in the video contacts.

After returning to Florida, Daughter fell from her stroller onto Grandmother's brick driveway and suffered a minor head injury. Wife did not inform Husband of this and when he emailed the following day to ask about Daughter, Wife told him she was fine. Husband did not learn of the accident until three weeks later when he received an explanation of insurance benefits. When Husband asked about the accident, Wife claimed Daughter had fallen from a bed onto something soft and the injury was not significant. Husband testified that when he again asked how Daughter was injured and why Wife lied about how she fell, Wife responded, "Why don't you call CPS and find out." On June 7, Husband made a report to the Florida Department of Children and Families because Wife would not allow him to see Daughter and he wanted someone to check on the baby.

On June 18, Husband asked to visit Daughter in Florida; Wife declined because she had friends coming to town to celebrate Wife's birthday. On June 20, Husband filed a complaint seeking custody and Daughter's return to Aiken;[11] Wife filed her

---

[11] Despite his knowledge that Wife has been a United States citizen since before they were married, Husband's complaint stated Wife "is a Russian Citizen and owns a home in Russia and [Husband] is concerned that she might flee the United States with their Daughter." When questioned about this during his deposition, Husband testified he was in a hurry to bring Daughter back to South Carolina and filing an inaccurate complaint is "not a big deal."

own complaint seeking custody and child support the next day.  Following an expedited hearing, the family court consolidated the two actions, granted temporary joint custody, ordered the parties to follow the recommendations of Daughter's pediatrician, precluded Daughter's removal from South Carolina without the other parent's written consent, awarded Husband physical custody immediately following the July 9 hearing through August 2, and appointed a guardian ad litem (GAL).[12]

The parties continued to disagree about vaccinations, and this dispute came to a head at the baby's July 19 pediatrician appointment.  Dr. Luther recommended standard vaccinations but refused to administer them without both parents' written consent.  Husband consented to all three recommended vaccines but after two hours, Wife would consent to only one.[13]  The following day, Husband filed a rule to show cause over Wife's failure to comply with the pediatrician recommendation provision in the first temporary order, and Wife was ordered to appear for a September hearing.  In the interim, the court issued a second temporary order requiring that Daughter be vaccinated in accordance with Dr. Luther's recommendations; the parties subsequently entered a consent order holding Husband's rule to show cause in abeyance conditioned upon Wife's compliance.

By consent order, licensed psychologist Marc Harari was selected to serve as custodial evaluator.  In her interviews with both Dr. Harari and GAL Jessica Brilhante, Wife raised concerns about Husband's family and noted Husband's comments regarding Wife's lack of knowledge about what might happen while Daughter was in Husband's bedroom.  Although Wife recognized she had insinuated Husband was sexually inappropriate, she later admitted she did not believe Husband molested Daughter or behaved inappropriately with his mother or sister.  Still, she was disturbed by Husband's inferences and earlier statements suggesting Daughter could be raped without Wife's knowledge.

In the ensuing months, the parties continued to disagree about visitation, traveling, childcare, and healthcare.  Following a February 10, 2021 hearing, the family court addressed several issues by February 26 order.  The order set a week-to-week parenting schedule with the parties to exchange Daughter on Fridays at 4:00 p.m.;

---

[12] At this point, Daughter's weight had fallen to the ninth percentile, she was behind on vaccinations, and she had a slight delay in gross motor development.

[13] The parties dispute what actually happened at the appointment, but Dr. Luther's medical record notes, "Immunization not carried out because of caregiver refusal."

provided for daily contact during the other party's parenting time; and gave each parent the right of first refusal regarding childcare during the workday. The family court further permitted Wife to take Daughter to Florida during her parenting time, required the parties to follow the CDC's Covid-19 guidelines, and found Wife had not met her burden of proof with respect to her request for a rule to show cause addressing Husband's alleged failure to inform Wife of a doctor's appointment.

The parties' final hearing was held in late September 2021. Wife asserted the frenectomy caused the breakdown of the marriage and noted Husband's constant monitoring of Wife and Daughter as one of the reasons she left the marital home.[14] Wife discussed her plan to remain in the North Augusta or Aiken County area, noted she had enrolled Daughter in extracurricular activities in Augusta, and requested physical custody and a traditional visitation schedule for Husband. Wife also testified she preferred to remove Daughter from Husband's private insurance and put her on Medicaid so Husband's insurance payments would not be considered in the child support calculation.

Husband alleged finances caused the breakdown of the marriage. He admitted he violated the February order by enrolling Daughter in daycare without providing Wife the right of first refusal; he further failed to list Wife's legal name or contact information on the daycare paperwork. Husband requested physical custody and 50/50 parenting time.

Neutral observers—Dr. Harari, the GAL, and retired family court judge and co-parenting counselor Donna Strom—testified both parents love Daughter, but their inability to co-parent remains problematic. According to the GAL, the parties' issues include "how they communicate, how they respect each other as a parent, how they respect each other's opinions and beliefs." Judge Strom testified Husband was unwilling to compromise, angry, and controlling, while Wife was "firm and willing to compromise."[15] The family court judge concluded the hearing

[14] In addition to the video monitoring, there is evidence in the record that around the time of their March 2019 separation, Wife discovered Husband had been signed into her Gmail account since April 4, 2015.

[15] Wife's doula, Ashley Brio; sister, Dr. Yekaterina Lyon; Grandmother; Dr. Luther; Dr. Harari; and Husband's friend Soren McMillian all described Husband as "controlling" or "exhibiting controlling tendencies." According to Brio, "[w]hile [Husband] was hands-off with respect to [Daughter], he was highly controlling of [Wife] and how she should parent and behave." Although Brio personally

by describing the Prebirth Message as a most "unbelievable piece of evidence" and noted its concern with the number of firearms Husband had in the house.

Following the final hearing, Wife moved with Daughter to Augusta and the parties again had a dispute over the child's medical well-being. Husband sent Wife an Our Family Wizard (OFW) message on December 6, asking if Daughter still had a cough and runny nose. After confirming Daughter was still symptomatic, he sent Wife an OFW message informing her of Daughter's December 8 appointment with Dr. Luther. When Wife cancelled the appointment, Husband sent her another OFW message indicating he had rescheduled the appointment because Daughter had been sick for two weeks. Although Dr. Luther diagnosed Daughter with a bilateral ear infection and prescribed antibiotics, Wife declined to fill the prescription. Husband was understandably concerned, and Dr. Luther reluctantly suggested the parties could wait two to three days to see if the infection would clear naturally before revisiting the need for antibiotics. The parties had yet another disagreement over whether to wait, the infection did not clear, and Daughter ultimately started the necessary antibiotics.

The family court granted the parties a divorce on December 28, 2021. In its January 25, 2022 final order, the family court explained the division of assets was atypical because the parties only cohabitated briefly and had generally been responsible for their own expenses. Consistent with its statements at the end of the final hearing, the family court concluded Husband's words in the Prebirth Message showed "complete inflexibility and a total lack of an emotional connection with [Daughter]." The court referenced the custody award as "joint custody,"[16] with Wife to have primary custody and "final decision making authority except as to medical decisions" and Husband to have medical decision making authority.[17] The

_____

disagreed with some of Wife's choices regarding vaccinations, she "did not observe [Wife] to engage in any neglectful or problematic parenting practices. Instead, it was evident that both parents had major disagreements which appeared to contribute to their conflict."

[16] Specifically, the court stated, "The parties shall have joint custody of the minor child to the point of telling and informing each other of decisions regarding [Daughter], but not to the point of a discussion that must reach an agreement. The requirement is to inform, not discuss."

[17] Regarding visitation, the family court ordered that during the school year, Husband "will have the child every other weekend from Thursday at 6:00 pm until

family court also warned Husband "of the consequences of abusing this authority" in light of his history of "demanding control even to the point of using it solely to get at the mother." Additionally, the court precluded the parties from taking Daughter to Lebanon, found Wife could claim her as a tax dependent, ordered Husband to return or replace Wife's engagement ring, apportioned other assets, ordered Husband to pay $40,000 of Wife's attorney's fees, and emphasized the parties' obligations to inform each other of decisions involving Daughter. Both parties filed motions to reconsider, which the family court denied.

**Standard of Review**

"Appellate courts review family court matters de novo, with the exceptions of evidentiary and procedural rulings." *Stone v. Thompson*, 428 S.C. 79, 91, 833 S.E.2d 266, 272 (2019). However, this broad scope of review does not require the appellate court to disregard the fact that the family court saw and heard the witnesses and was in a better position to evaluate their credibility. *Lewis v. Lewis*, 392 S.C. 381, 385-86, 709 S.E.2d 650, 651-52 (2011). "Moreover, consistent with our constitutional authority for *de novo* review, an appellant is not relieved of his burden to demonstrate error in the family court's findings of fact." *Id*. at 392, 709 S.E.2d at 655.

## I. Custody, Visitation, and Decision-Making Authority

Husband argues the family court erred in granting Wife primary custody and general decision-making authority, while Wife argues the court erred in setting Husband's visitation and in awarding him medical decision-making authority. We find no error, and we affirm the family court's awards of custody, visitation, and assigned categories of parental decision making.

---

the following Monday when he takes [her] to school or daycare at 9:00 (or when the school day requires as she ages)" and "[e]very other Monday night from 6:00 until return to school or daycare the next morning no later than 9:00 (certainly earlier if his job requires it). This Monday is to be on the Monday following mom's full weekend." The court granted alternating weeks during summers (with each party to have a two-week summer increment), provided specifics for various holiday periods, and specified the number and length of phone calls and video chats each party is entitled to have when Daughter is with the other parent.

The family court has exclusive jurisdiction "to order joint or divided custody where the court finds it is in the best interests of the child." S.C. Code Ann. § 63-3-530 (A)(42) (2010). Section 63-15-230 of the South Carolina Code (Supp. 2023) mandates the following regarding a final custody determination:

> (A) The court shall make the final custody determination in the best interest of the child based upon the evidence presented.
>
> (B) The court may award joint custody to both parents or sole custody to either parent.
>
> (C) If custody is contested or if either parent seeks an award of joint custody, the court shall consider all custody options, including, but not limited to, joint custody, and, in its final order, the court shall state its determination as to custody and shall state its reasoning for that decision.
>
> (D) Notwithstanding the custody determination, the court may allocate parenting time in the best interest of the child.

"In a child custody case, the welfare of the child and what is in the child's best interest is the primary, paramount, and controlling consideration of the court." *Klein v. Barrett*, 427 S.C. 74, 80, 828 S.E.2d 773, 776 (Ct. App. 2019) (quoting *McComb v. Conard*, 394 S.C. 416, 422, 715 S.E.2d 662, 665 (Ct. App. 2011)). "In determining a child's best interest in a custody dispute, the family court should consider several factors, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties, including the guardian ad litem, expert witnesses, and the children; and the age, health, and gender of the children." *Simcox-Adams v. Adams*, 408 S.C. 252, 260, 758 S.E.2d 206, 210 (Ct. App. 2014); *see also* S.C. Code Ann. § 63-15-240(B) (Supp. 2023) (providing a non-exhaustive list of factors a family court order "issuing or modifying" custody may include). "While numerous prior decisions set forth criteria that are helpful in such a determination, there exist no hard and fast rules and the totality of circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Clark v. Clark*, 423 S.C. 596, 605, 815 S.E.2d 772, 777 (Ct. App. 2018) (quoting *Davenport v. Davenport*, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975)).

Here, we agree with the family court that the parties "are not compatible enough to be in a marriage, much less rear a child together," and that "[t]he record is replete with arguments, conversations, communications between these parties wherein [Daughter] is the trophy to be won and the war is a 'take no hostages' battle." We further understand the family court's belief that "[i]n [Husband's] words, he shows complete inflexibility and a total lack of emotional connection with [Daughter]." But our review of the record leads us to believe Husband's words were—and are—generally designed to hurt Wife. While he may have lacked the referenced emotional connection with the baby at the time of the Prebirth Message, both Wife and Grandmother acknowledged at the final hearing that Husband indeed has an emotional connection with Daughter. We do, however, agree with the family court's concern that Husband "was enmeshed to the point of obsession regarding the day-in day-out routine habits of [Daughter]'s care while he was working." We also agree that a "disturbing trend of these parents is the obtaining of medical treatment without agreement and knowledge of the other. They could have endangered this child's life by not telling the other of procedures or vaccinations." And, the record supports the family court's impression that while Wife acts out of "fear and control," Husband acts out of "extremely poor insight as to how his behavior will affect his relationship with [Daughter]."

In his custody evaluation report, Dr. Harari stated:

> Looking to the future, [Husband]'s rigidity and anxious tendencies could create conflict in the father-daughter relationship, especially as [Daughter] becomes an adolescent and develops a need for autonomy. Specifically, such tendencies may contribute to an authoritarian parenting style, in which a parent maintains high expectations and lacks warmth. (Baumrind, 1991). It is well established in the literature that an authoritarian parenting style is associated with concurrent and future psychological distress for children (Gould and Martindale, 2007). While [Husband] exhibited appropriate parental warmth with [Daughter] during the course of this evaluation, she is young and fully compliant with her father's directives. He can be perceived as argumentative and angry when individuals disagree with him. Therefore, [Husband]'s warmth may be conditional upon him obtaining his way. As his

Daughter becomes an adolescent, she will naturally seek independence and disagree with or disobey him at times.

Although Dr. Harari's report "solely addressed abuse and neglect of the child rather than the domestic violence history described by each parent," he recognized the evidence of Husband's controlling behavior toward Wife. While Dr. Harari agreed Husband's various behaviors were a form of coercive control, he declined to label Husband as a "coercive controlling violent person" or a "physical batterer."

Dr. Harari's report also offered options regarding custody, and he testified in his deposition that "this is a case where probably one parent has to have final decision-making [authority]." Dr. Harari noted Husband considers Wife "essentially incompetent and unfit to parent" and this attitude affects the co-parenting relationship.[18] He further observed that although Wife respects Husband's role as a father, she nevertheless "maintains vast mistrust of [his] future motives." As for Wife's behavior while in Florida, Dr. Harari agreed some of her gatekeeping could be described as protective rather than restrictive. He further opined Wife had not engaged in such gatekeeping behavior since returning to South Carolina.

We find the parties' toxic relationship presents a potential, if not imminent, risk of harm to Daughter's mental health. We further find the family court, which was in a better position to evaluate the witnesses' credibility and assign comparative weight to their testimonies, properly awarded Wife primary custody. While the family court did not specifically address all factors applicable to its custody decision, our review of the record and consideration of the pertinent statutory factors supports the family court's custody award. Although we decline to rehash all facts pertaining to every factor supporting the family court's custody determination, we note the following circumstances support the award: Wife moved to Aiken with Husband to become a stay-at-home mom and has been Daughter's primary caretaker; despite their atrocious conduct toward one another, Wife—although misguided regarding medical care and treatment—generally sought to act in Daughter's best interests while Husband did not always act in her best interests; Dr. Harari's opinions regarding Husband's parenting style and psychological functioning are concerning; and other neutral observers opined that while both parents love Daughter, they are unable to effectively co-parent. Although there is no definitive evidence of domestic abuse, Husband's controlling behavior and his

---

[18] Despite his impression of Wife's parenting abilities, Husband testified the best physical custody arrangement would be to continue the 50/50 split.

"my way or no way" tendency—acknowledged by his friends and colleagues and specifically noted by at least one of the law enforcement witnesses—is of great concern to this court from a custody standpoint. Accordingly, we find the family court properly awarded Wife primary custody.

Regarding visitation, this court presumed Husband and Wife had been rotating Daughter's placement according to the January 2022 final order without further involvement from the family court or law enforcement. However, we learned at oral argument that the parties have had additional visitation issues since the final hearing. Still, despite Wife's domestic violence insinuations, Grandmother's testimony regarding threats, and testimony from numerous witnesses that Husband is controlling, there is no evidence of *physical* abuse in the record. Although Dr. Harari acknowledged "coercive control is a form of domestic violence," he declined to label Husband as a "coercive controlling violent person" or a "physical batterer." Thus, we find the family court did not err in setting Husband's visitation.

Although Husband and Wife both love Daughter, throughout this case they have created conflict over even the smallest decisions. Dr. Harari, the GAL, Judge Strom, and Dr. Luther all agreed these parties are unable to effectively co-parent. In light of the neutral observers' opinions, the parties' inability to agree on almost anything, and the history of one parent unilaterally making medical and major life decisions for Daughter without consulting (or even informing) the other, the family court's delineation of categories of responsibility for decisions affecting Daughter's life and care was critical here. *See, e.g., Greene v. Greene*, 439 S.C. 427, 444, 887 S.E.2d 157, 166-67 (Ct. App. 2023) (noting to the extent mother and father disagreed when making decisions for their child, "the record support[ed] the family court's assignment of the decision-making categories for Child's parenting.").

As for medical decisions, although it concerns us that Husband was reluctant to even consider the frenectomy recommendation in light of the baby's difficulties breastfeeding and maintaining a healthy weight, there is greater problematic evidence regarding Wife's approach to Daughter's medical care. Wife's "history of withholding care that is recommended by [Daughter's] physicians" includes failing to supplement her diet, refusing to vaccinate her despite medical recommendations and at least one court order requiring her to do so, and declining to fill a prescription for antibiotics after the baby suffered several days of fever and illness. These are just a few of the examples in the record supporting the family court's award of medical decision-making authority to Husband.

The family court's well-reasoned order granting Wife all remaining decision-making authority is not only the best way to relieve some of the conflict between these parties while serving Daughter's best interests, it is the logical choice in this unfortunate situation. We applaud the efforts of the family court to sort through this voluminous record and effectively address a difficult custody situation.

## II.    Dependent Tax Deduction

Husband argues the family court erred in allowing Wife to claim Daughter as a tax dependent because Wife was unemployed at the time of the final hearing and Husband is responsible for a greater share of child support. Our review of the record reveals that at trial, Husband did not make this argument or request the dependent tax deduction should Wife be awarded primary physical custody. Instead, he first raised this argument in his motion to reconsider, and the family court appropriately declined to consider it. *See Gartside v. Gartside*, 383 S.C. 35, 43, 677 S.E.2d 621, 625 (Ct. App. 2009) ("[A] party cannot use a Rule 59(e) motion to present to the family court an issue the party could have raised prior to judgment but did not."). Under such circumstances, this question is unpreserved for our review. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) (reiterating that "[a] party may not argue one ground at trial and an alternate ground on appeal").

## III.    Equitable Distribution

Husband and Wife argue the family court erred in its equitable distribution of the marital estate. We agree in part.

"The term 'marital property' as used in this article means all real and personal property which has been acquired by the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation." S.C. Code Ann. § 20-3-630 (2014). "However, '[p]roperty acquired prior to the marriage is generally considered nonmarital.'" *Pittman v. Pittman*, 407 S.C. 141, 148, 754 S.E.2d 501, 505 (2014) (quoting *Pirri v. Pirri*, 369 S.C. 258, 269, 631 S.E.2d 279, 285 (Ct. App. 2006)). "Nevertheless, '[p]roperty that is nonmarital when acquired may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property.'" *Id.* at 148, 754 S.E.2d at 505 (alteration in original) (quoting *Wilburn v. Wilburn*, 403 S.C. 372, 384, 743 S.E.2d 734, 740 (2013)).

Although "marital property subject to equitable distribution is generally valued at the divorce filing date[,] . . . . the parties may be entitled to share in any appreciation or depreciation in marital assets occurring after a separation but before divorce." *Burch v. Burch*, 395 S.C. 318, 325, 717 S.E.2d 757, 761 (2011); *see also Fuller v. Fuller*, 370 S.C. 538, 546, 636 S.E.2d 636, 640 (Ct. App. 2006) (finding no error when the family court valued IRA and its passive increase at date of final hearing rather than divorce filing date); *Bowman v. Bowman*, 357 S.C. 146, 159, 591 S.E.2d 654, 660 (Ct. App. 2004) (holding when the husband actively and intentionally depleted his retirement account, the account should be valued as of the filing date); *Dixon v. Dixon*, 334 S.C. 222, 233-34, 512 S.E.2d 539, 544-45 (Ct. App. 1999) (finding proper valuation date for business was filing date where the husband actively set out to destroy the business during the marital litigation); *Mallett v. Mallett*, 323 S.C. 141, 151, 473 S.E.2d 804, 810 (Ct. App. 1996) (holding when the husband's insurance business decreased passively due to market forces, "it would be grossly unfair to value this asset" at date of filing); *McDavid v. McDavid*, 333 S.C. 490, 496-97, 511 S.E.2d 365, 368-69 (1999) (finding that because increase in marital home equity from time of filing to time of trial stemmed from mortgage payments made solely by the wife, the husband was not entitled to share in the increased equity and valuation date should be date of filing).

"Although statutory factors provide guidance, there is no formulaic approach for determining an equitable apportionment of marital property." *Lewis*, 392 S.C. at 391, 709 S.E.2d at 655; *see also* S.C. Code § 20-3-620 (B) (2014) (setting out fifteen statutory factors for the family court to consider in apportioning marital property). "In the absence of contrary evidence, the court should accept the value the parties assign to a marital asset." *Pirri*, 369 S.C. at 264, 631 S.E.2d at 283 (quoting *Noll v. Noll*, 297 S.C. 190, 194, 375 S.E.2d 338, 340-41 (Ct. App. 1988)). "A family court may accept the valuation of one party over another, and the court's valuation of marital property will be affirmed if it is within the range of evidence presented." *Pirri*, 369 S.C. at 264, 631 S.E.2d at 283.

### A. Engagement Ring

Husband argues the family court exceeded its jurisdiction in ordering him to return or replace Wife's engagement ring. Husband further asserts Wife was not a credible witness. We disagree.

Although we recognize unpublished opinions lack precedential weight, we are persuaded by this court's analysis addressing engagement rings in *Moring v. Moring*, Op. No. 2004-UP-605 (S.C. Ct. App. filed Dec. 3, 2004). There, the court

disagreed with the husband's argument that the family court erred in ordering him to transfer the engagement ring in his possession back to the wife because it was properly considered nonmarital property. *Id.* at *7. While acknowledging the husband was correct in asserting the family court lacked jurisdiction to apportion nonmarital property, the court reiterated that the family court indeed had jurisdiction to determine what was and was not marital. *Id.* at *8. Thus, "the [family] court did not 'apportion' the non-marital property, but merely determined it was in fact non-marital and belonged to [the wife]." Accordingly, "the family court properly determined Wife was entitled to possession and ownership of the [engagement] ring." *Id.*; *see also Frank v. Frank*, 311 S.C. 454, 457, 429 S.E.2d 823, 825 (Ct. App. 1993) ("An antenuptial gift of an engagement ring is the recipient's separate property.").

At the final hearing here, Wife testified Husband kept all of her rings in a locked safe in his own bedroom and that when she vacated the marital home, she did not take her heart-shaped diamond engagement ring. When Husband was asked to identify all nonmarital property in Wife's possession, he did not list the engagement ring despite listing other jewelry. On August 14, 2019, Husband had Wife sign a list of the items she was taking from the marital home, and the engagement ring is not on that list. In fact, Wife made a handwritten note on the list indicating she "[d]id not take valuable Jewelry + rings." And, Husband created two documents that support Wife's contention that she did not have the ring. Given the evidence in the record, we find the family court properly ordered Husband to either return the ring, a premarital gift, or pay Wife $5,000 to replace it.[19]

### B. Accounts

In its final order, the family court noted Husband and Wife were married for just twenty-one months before they separated and twenty-four months before Husband filed his complaint. The court further found the parties lived together for only seven months. Due to this brief period of cohabitation, the family court substantially deviated from a 50/50 split of marital assets.

In dividing the marital assets, the family court considered several individual accounts belonging to Husband and Wife, only some of which are at issue on appeal. It equally divided Husband's Vanguard account, setting the value at $28,076, and valued one of Husband's Areva accounts of €18,596 at $21,570,

---

[19] Wife's presented evidence that the ring had previously been appraised at $5,400.

finding Wife was entitled to ten percent of this Areva account's value ($2,157) "as some marital funds were deposited into this account, but minimal as to [the] total account."  The family court valued Husband's other Areva account of €6,998 at $8,117 and found Wife was entitled to ten percent ($812).  Husband's Bank of America (BOA) account ending in 6752 was valued at $34,101, and the family court found Wife was entitled to twenty percent ($6,820) of this.

Additionally, the family court valued Wife's Thrift Savings Plan (TSP) account at $115,743, and awarded Husband twenty percent ($23,148) "as some marital funds were deposited into this account, but minimal as to [the] total account."  The court noted Wife's financial declaration reflected she deposited funds into this account during the marriage and there was growth in these funds.  Finally, the family court valued Wife's Edward Jones account at $42,938, and determined Husband was entitled to ten percent of the value of this account ($4,294) because Wife deposited $5,500 into the account during the marriage.  The court concluded Husband owed Wife $9,789 from his accounts and Wife owed Husband $27,452[20] from her accounts—a net of $17,663 due to Husband.  Combined with the initial equitable distribution, the family court found Husband owed Wife $11,528.00.

### 1.  Husband's Vanguard Account

Wife argues the family court erred in failing to account for post-filing growth and a pendente lite withdrawal Husband took from his Vanguard account.  We agree.

During his deposition, Husband testified he and his employer deposited funds into the Vanguard account during the parties' marriage.  He acknowledged the funds deposited into this account were marital funds, and he presented no evidence that he opened this account prior to the marriage.  At the final hearing, Husband recognized his equitable distribution valuations used date-of-filing values while his financial declaration used current values.  And, although Husband's September 20, 2021 financial declaration set the value of his 401k at $27,080.31, this valuation failed to account for a $21,985.18 withdrawal Husband took during the second quarter of 2020.

While the family court valued Husband's Vanguard account at $28,076 and divided it equally, our review of the record reveals this value came from Husband's June

---

[20] This includes Husband's award of $10 from Wife's State Employees Federal Credit Union (SEFCU) account, which is not at issue.

30, 2019 valuation and failed to account for two years of passive increase. *Cf. Fuller*, 370 S.C. at 546, 636 S.E.2d at 640 (finding no error when the family court valued IRA with passive increase at date of final hearing rather than divorce filing date). We further find the family court erred in failing to include Husband's sizable post-filing withdrawal in its valuation and apportionment. *See Bowman*, 357 S.C. at 159, 591 S.E.2d at 660 (finding when husband actively and intentionally depleted his retirement account, the account should be valued at the filing date). Because we can find no evidence in this record as to the value of the Vanguard account as of the date of the final hearing, we reverse and remand this question to the family court with instructions to review the statements and other necessary documentation for the Vanguard account, add the withdrawn $21,985.18 to the account value, and revalue the Vanguard account as of the date of the final hearing in order to fairly compensate Wife. The family court should equally divide the Vanguard account between the parties once this valuation is made.

### 2. Husband's Areva Amundi and Credit Mutuel Accounts

Husband argues the family court erred in dividing his "Areva account" twice, while Wife argues the family court erred in both the valuation and distribution of Husband's first Areva account.[21] Initially, we note Husband's Areva Amundi and Areva Credit Mutual statements are in French. While both parties speak French, we can only speculate about some of the account statements' information as we admittedly do not speak French well enough to feel comfortable declaring their contents. We also note neither party offered any testimony regarding Husband's Amundi account at the final hearing.

At his deposition, Husband confirmed that between June and December 2017, Areva deposited a total of €21,494.44 into one of his French accounts, although he did not specify which one. He also testified that in January 2018, Areva deposited €20,898.61 into his Credit Mutual account to compensate him for unused vacation days under his French contract when he moved to the American contract. However, we see no documentation relating to the alleged compensation for unused vacation days and the only Credit Mutual statement in the record, dated July 8, 2019, shows a checking account ending in 1401 with a balance of €6,993.91 and a savings account ending in 1405 with a balance of €22,667.45. Although Husband admitted to depositing at least some portion of his salary into his Credit Mutuel accounts during his deposition, he declined to answer whether

---

[21] After obtaining his post-doctorate degree, Husband was hired as an advisory scientist for Orano (formerly Areva) in Paris; he was transferred to Aiken in 2012.

any money from these accounts was used in support of the marriage.  At the final hearing, Husband acknowledged he had two separate accounts with Credit Mutuel into which Areva deposited funds during the marriage, but he failed to provide the family court with necessary documentation as to those account values.

It appears from the documents Husband did provide that he had a least three French accounts into which Areva was depositing funds: one with Amundi and two with Credit Mutuel.  Although the family court's order discusses two "Areva accounts," it is logical to conclude that the court was referring to Husband's two accounts with Credit Mutuel.  Because there is some evidence in the record that both Credit Mutuel accounts were marital or transmuted, we find the family court did not err in dividing them between the parties.  However, given the amount of money Husband deposited into the Credit Mutuel accounts after the parties' marriage, we disagree with the family court's finding that "minimal" contributions were made into these accounts during the marriage.  Because this court is unable to ascertain the value of either Husband's Amundi account or his Credit Mutuel accounts as of the date of the final hearing, we reverse and remand these questions to the family court.  The court should review the bank statements or other necessary documentation for *all* of Husband's Areva (Amundi, Credit Mutuel, or otherwise) accounts held during the marriage and revalue and reapportion them.  Husband shall pay for a translator should one be necessary to aid the family court's review because his evasive testimony and movement of funds among the various accounts (along with his steadfast refusal to candidly acknowledge the marital nature of certain transferred funds or even admit the existence of certain accounts) has caused much of the confusion here.

### 3.  Husband's BOA Accounts

Wife argues the family court erred in awarding her only twenty percent of the value of Husband's BOA account ending in 6752 and in finding "some marital funds were deposited into this account, but [such funds were] minimal as to [the] total account."  We agree.

Husband deposited a $25,000 check from Wife's premarital savings into another BOA account ending in 1855 on January 2, 2018, so that he could purchase a Jaguar from account 6752.  The following day, Husband transferred $24,500 from account 1855 into account 6752.  Then, Husband transferred $43,000 from account 6752 to pay for the Jaguar.  Before the parties separated, Wife told Husband he needed to repay her the $25,000 she loaned him to purchase the vehicle—less some $5,000 Husband paid for Wife to obtain her master's degree—to take care of

Daughter, but Husband told her he no longer owed her anything because she had harmed Daughter by taking her to get the (medically necessary) frenectomy. At the final hearing, Husband testified Wife did not loan him the money for the Jaguar—he claimed she gave it to him. He then refused to agree that "car loan" appeared on the check's memo line and testified he did not remember seeing it there. When asked whether he paid Wife back any of this loan," Husband responded, "I paid for her tuition at the University." Additionally, Husband testified his salary was deposited into this account, and there is evidence of transfers between BOA accounts 1855 and 6752. In light of Husband's testimony that his salary was deposited into account 1855, the commingling of funds in BOA accounts 1855 and 6752, and the fact that the funds Wife loaned Husband to buy the Jaguar traversed both BOA accounts, we reverse the family court's apportionment of the BOA account ending in 6752 and reapportion it equally between the parties. Thus, we find Wife is entitled $17,060.50, or fifty percent of the value of BOA account 6752.

### 4. Wife's TSP Account

Husband argues the family court erred in awarding him only twenty percent of Wife's TSP account. Conversely, Wife argues the family court erred in awarding Husband twenty percent of the value of her TSP account because only $28,227 of the $115,743 date of trial value resulted from marital contributions or growth during the marriage. The value of Wife's TSP account as of the date of filing was $76,593.08. Wife's financial declaration lists $28,227 as the "Marital portion growth" of the account. She testified that approximately $18,000 of this amount consisted of contributions she made during the marriage and approximately $10,000 was attributable to growth from premarital contributions. Although Wife offered to provide the family court with account statements supporting her position, the court indicated it did not need this information.

The family court then valued Wife's TSP account at $115,743, awarded Husband twenty percent of the total account value ($23,148), and again noted "some marital funds were deposited into this account, but minimal as to [the] total account." Although the family court correctly valued Wife's TSP account at the time of the final hearing, it erred in disregarding Wife's testimony that approximately $10,000 of this growth resulted from her own premarital contributions. Thus, we reverse and remand for the family court to revalue and reapportion the marital portion of Wife's TSP account. *See Clark v. Clark*, 430 S.C. 167, 183, 843 S.E.2d 498, 507 (2020) (reversing in part due to improper valuation of husband's business).

Wife shall provide the statements offered at the hearing to assist the family court with this valuation, and Husband may offer any other relevant documentation pertaining to this account in response to the documentation Wife provides.

### 5. Wife's Edward Jones Account

Finally, Husband argues the family court erred in awarding him only ten percent ($4,294) of Wife's Edward Jones individual retirement account (IRA) ending in 9716. Conversely, Wife argues that because she only deposited $5,500 into the Edward Jones IRA during the marriage, the family court erred in awarding Husband ten percent ($4,294) of the full account value in the equitable distribution.

Wife's Edward Jones Portfolio shows two separate accounts—an IRA ending in 9716 with a balance of $10,576.12 and a Single Account (SA) ending in 6616 with a balance of $32,362.53 as of the date of filing. Although Wife acknowledged she opened the Edward Jones Portfolio during the marriage and the $5,500 she contributed to her Edward Jones IRA is marital, she testified at the final hearing that some of the cash to fund the portfolio came from premarital funds. However, she listed the "Value of Publicly Held Stocks, Bonds, Securities, Mutual Funds" as "approximately $37,000" under marital property on her July 8, 2019 financial declaration and again listed $37,000 on her October 17, 2020 financial declaration. Thereafter, Wife listed the "Value of Voluntary Retirement Accounts" at $33,727 under marital property and the Edward Jones IRA ending in 9716 with a $5,500 marital contribution under "Voluntary Retirement Accounts and Pension Accounts" on her September 21, 2021 financial declaration. Husband's equitable apportionment worksheet shows Wife's SEFCU account had a balance of $49,529.57 as of the date of the marriage.[22] Additionally, Husband testified at the final hearing that Defendant's Exhibit 38 shows Wife transferred $25,464 from her SEFCU account to her Edward Jones portfolio on September 10, 2018.

In its final order, the family court found, "[Wife]'s Edward Jones account is valued at $42,938. [Husband] is entitled to 10% of the value of this account as $5,500 went into this account during the marriage. [Husband] is entitled to $4,294 to effectuate equitable distribution." In her Rule 59(e) motion, Wife argued the family court failed to distinguish the two Edward Jones accounts. At the hearing

---

[22] Although we assume Wife transferred the funds from her Edward Jones SA ending in 6616 into her Edwards Jones IRA ending in 9716, we have been unable to find conclusive documentation of such in the record.

on the motions to reconsider, the following exchange took place between the family court and Wife's counsel:

> [Court]: Okay. It looks like on page 281 on that Edward Jones account, and we had a conversation, the attorneys—it's 28—grouped by 28,277 of which 18,000 was growth on the money that she put in during the marriage as Mr. Forman—me saying her paycheck deposited. Mr. Forman, the remainder of the growth is the growth that occurred over years.
>
> [Court]: It's 10,000 growth on the plan and $18,000 contribution, which makes up the 28, is that right?
>
> [Wife]: Yes.
>
> . . . .
>
> [Wife]: As, as I understand, they're actually two Edward Jones accounts on that one statement. There's a[n] investment account and IRA—retirement account and just nod your head yes if I'm correct on that. Just—okay. So, I think part of it is the Court sort of thought there was just one account when there were actually two and she deposited funds into one of those accounts during the marriage but not the other.
>
> [Court]: Okay. Well, I'm denying the motion.

Although there is evidence in the record that the majority of Wife's Edward Jones portfolio was funded with nonmarital property, without more documentation than has been provided for our review, it is difficult to determine the degree to which these funds may have been transmuted. *See Pittman*, 407 S.C. at 148-49, 754 S.E.2d at 505 (noting nonmarital property "may be transmuted into marital property if it becomes so commingled with marital property that it is no longer traceable, is titled jointly, or is used by the parties in support of the marriage or in some other way that establishes the parties' intent to make it marital property" (quoting *Wilburn*, 403 S.C. at 384, 743 S.E.2d at 740)). We thus reverse and remand the valuation and apportionment of the Edward Jones IRA with instructions that the family court consider Wife's Edward Jones Portfolio in

conjunction with other account documentation in the record as may be necessary to calculate marital versus nonmarital percentages.  The family court should then equitably apportion only the funds (and fund growth) the court deems marital.

## IV.    Travel to Lebanon

Husband argues the family court erred in precluding the parties from taking Daughter to Lebanon.  We disagree.

At the time of the final hearing, Husband was a citizen and passport holder of both Lebanon and France.  He described himself as "a mix of western and very westernized eastern person, because, obviously, Lebanon is very European, but I have lived in the west.  I'm very westernized."  In her answer and counterclaim, Wife stated her belief that Husband is "capable and emotionally able" to take Daughter out of the country.  And, there is evidence in the record that both parties discussed such travel with Judge Strom.  When Wife sought to take Daughter to see her grandfather in New York, Husband refused to allow Daughter to go unless Wife allowed the child to travel with him to Lebanon.  He then took it upon himself to cancel the plane tickets Wife purchased for the New York trip.  Wife testified she had no problem with Daughter traveling with Husband to France but was concerned because Lebanon is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction.  Wife further referenced the State Department's travel advisory for Lebanon.

In his amended Rule 59(e) motion to reconsider, Husband argued:

> Paragraph 27: No travel to Lebanon: The court followed the request of [Wife] and prevented travel to Lebanon. The court did not take into account the looming war between Russia, Ukraine and possibly the NATO alliance including the USA.  Lebanon is in no conflict with the USA.  [Husband] believes that for the protection of the minor child, the court order should include Russia, Ukraine and all other countries that are not members of the Hague Convention in the "no travel ban", taking into consideration the current political and controversial situations in those countries.

Husband makes a different argument on appeal than he made to the family court in that he now asserts "this provision of the order is punitive and only has the effect

of intimating to Daughter that she should be ashamed of [Husband]'s home country and her heritage." *See Dunbar*, 356 S.C. at 142, 587 S.E.2d at 694 ("A party may not argue one ground at trial and an alternate ground on appeal."). We disagree that this is a punitive provision and find the family court's travel restriction to be well-reasoned and in Daughter's best interest. Accordingly, we affirm the order of the family court with respect to Daughter's travel and find it properly precluded the parties from taking her to Lebanon.

## V. Attorney's Fees

Both parties challenge the fee award. Husband argues the family court erred in awarding Wife $40,000 in attorney's fees because Wife has the resources to pay her fees, was uncooperative, and spent money on materials not used to present her case. Wife contends the family court should have awarded her fees related to the defense of Husband's motions to reconsider.

When determining whether to award attorney's fees, the family court considers four factors: "(1) the party's ability to pay his/her own attorney's fee; (2) [the] beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). In determining the amount of fees to be awarded, the family court considers "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991). It is appropriate for the family court to "consider a litigant's uncooperative and evasive behavior when determining the reasonableness of the fees." *Daily v. Daily*, 432 S.C. 608, 630-31, 854 S.E.2d 856, 868 (Ct. App. 2021).

In awarding a portion of the fees Wife requested, the family court noted most of the findings in the final order "explain the reason for the attorney fee award." The court stated it "did consider the factors in *EDM v. TAM* and *Glasscock*" and "also considered the settlement offers from the Plaintiff to the Defendant." And, the court specifically referenced "the parties' respective financial conditions," including the assets detailed in the equitable distribution analysis and the parties' monthly incomes. We find the family court's award of $40,000—less than half of the total fees Wife requested—was reasonable and appropriate given the circumstances of this case, specifically the complexity of the issues, the parties' respective abilities to pay, the time properly devoted to this contentious case, and

the professional standing of counsel.  And, we agree with the family court's recognition that "both parties were being represented by excellent attorneys and both attorneys [did] a very competent job representing their clients in this action." We thus affirm the initial award of $40,000 to Wife and note the behavior of the parties and beneficial results Wife obtained further support the award.

However, we reverse the family court's summary denial of Wife's request for a portion of the attorney's fees she incurred in defending Husband's post-trial motions.  Although Husband timely filed his initial post-trial motion seeking reconsideration of eleven issues, he then filed an amended motion two-and-a-half weeks later.  Some of the new matters raised in the amended motion were untimely under Rule 59(e); others sought redress as to issues not raised at trial.  Wife conceded one post-trial matter and successfully defended the others.  Accordingly, we find it appropriate to grant Wife the attorney's fees she incurred following Husband's amended filing and award her $4,480.00 of the requested $10,185.00 in fees related to defending Husband's post-trial motions.

## Conclusion

We affirm the orders of the family court as to custody, visitation, primary and medical decision-making, the dependent tax deduction, and Wife's engagement ring.  We further affirm the family court's initial award to Wife of $40,000 in attorney's fees; however, we reverse the denial of post-trial motion fees and award Wife $4,480.00 in additional fees.  We reverse and remand the valuation and apportionment of certain accounts as detailed in Section III.B.

We again commend the family court for its patience and consideration in this difficult case.  We urge these parties to prioritize the best interests of their daughter as their paramount concern in seeking to more courteously co-parent her.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**VINSON, J., and LOCKEMY, A.J., concur.**